Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(To Be Admitted *Pro Hac Vice*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone:  (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
(To Be Admitted *Pro Hac Vice*)
Bret R. Vallacher
(To Be Admitted *Pro Hac Vice*)
Matthew E. Layden
(To Be Admitted *Pro Hac Vice*)
MASSEY & GAIL LLP
1000 Maine Avenue, S.W. Suite 450
Washington, DC 20024
Telephone:  (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com
**Attorneys for Plaintiff and Proposed Class**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, as representative of the heirs of Rene Correa Borquez and on behalf of other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION; and KELMAR ASSOCIATES, LLC,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND COMPENSATORY AND PUNITIVE DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), as legal representative of the heirs of Rene Correa Borquez, brings this proposed class action on behalf of himself and all others similarly situated (the putative "Class") against Defendants, (a) Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, 125 West State Street, Trenton, NJ; (b) Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Administrator"), 50 West State Street, Trenton, NJ; and (c) Kelmar Associates, LLC, 500 Edgewater Drive, Wakefield, MA, and hereby alleges as follows:

### INTRODUCTION

1.     This proposed class action challenges, as applied and facially, the constitutionality of New Jersey's escheatment scheme enacted in the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.*, and other rules set forth in unpublished manuals, regulations, and practices (the "Act" or the "NJUPA").

2

2.      "The purpose of unclaimed property laws is to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner." *American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012).  New Jersey has stated that the NJUPA is aimed at "protecting consumers."  *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 398 (3d Cir. 2012).

3.      However, the NJUPA operates to frustrate this avowed statutory purpose.  Under the NJUPA, the Administrator appropriates the supposedly "abandoned" property of purportedly "unknown" persons without any prior notice in many instances, auctions it or otherwise sells it off, and retains the proceeds for the State of New Jersey's own use.  The property in question includes stock, contents of safe deposit boxes, retirement accounts, wages, refunds, deposits, gift cards, and many other forms of property.   The NJUPA deems property to be "abandoned" following a short period of inactivity and fails to provide constitutionally adequate notice – indeed, no notice at all in most instances – before the Administrator takes and permanently destroys the property.

4.      The NJUPA is generally considered to be one of the nation's most aggressive abandoned property statutes.  The Council on State Taxation ("COST") graded all 50 states based on the aggressiveness of their abandoned property laws.  New Jersey, along with California and Louisiana, received the COST's **lowest** grade: a "D."[1]

5.      Currently, the Administrator holds over an estimated **$6 billion**[2] in supposedly "unclaimed" property[3] owned by such famous persons as the pop star Taylor Swift, the award-

---

[1]      https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf.

[2]      New Jersey law allows for the release only of the property owner's name and address. Therefore, just as it is for the private owners, it is difficult or impossible for the public to determine how much unclaimed property, at any time, is in the custody of the State of New Jersey.

[3]      New Jersey Department of the Treasury, nj.gov/treasury,

winning actress Meryl Streep, Governor Phil Murphy, and businesses associated with President-elect Donald J. Trump.  The State of New Jersey deems all such persons "unknown" and purports to be unable to reunite these persons with the "unclaimed" property it has appropriated from them.

6.      Plaintiff is a citizen and resident of Chile who received no notice at all before his property (securities with substantial market value) was unconstitutionally seized and taken by the Administrator under the NJUPA.  The NJUPA contains no provision for direct mail notice or individualized notice whatsoever to overseas property owners like the Plaintiff alerting them that their property has been deemed "abandoned" and is subject to seizure by the State.  In addition, the NJUPA provides for no direct mail or other form of individualized notice to property owners in connection with the State's seizure of their property where the property in question is valued at less than $50.

7.      Plaintiff contacted the Administrator in an attempt to recover the property seized and taken by the State, but after years of delay, the Administrator grudgingly provided Plaintiff with only a fraction of the property's actual value.  The Administrator refuses to provide Plaintiff with adequate relief.  Absent the relief sought in this lawsuit, Plaintiff and the putative Class have no way to protect themselves against unnoticed property seizures.

8.      Because the NJUPA is unconstitutional both on its face and as applied, Plaintiff brings this action to secure prospective declaratory and injunctive relief, including injunctive relief requiring Defendant to return the property belonging to each Plaintiff and Class Member or otherwise put them in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken by the Administrator.

---

https://www.nj.gov/treasury/news/2023/08212023.shtml#:~:text=Searching%20and%20filing%20claims%20on,being%20safeguarded%20by%20the%20State (last accessed Dec. 17, 2024).

9.      Plaintiff also sues Kelmar Associates, LLC ("Kelmar"), the private auditor that provides administrative services to the State of New Jersey in connection with the NJUPA.  Kelmar negligently performed the services it provided under the NJUPA. Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.

## JURISDICTION AND VENUE

10.      This action is brought under 42 U.S.C. § 1983 and alleges that Defendants Muoio and Harris violated the constitutional rights of Plaintiff and all other similarly situated persons under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment (incorporated against the states under the Fourteenth Amendment).  This Court has subject matter jurisdiction of the claims against Defendants Muoio and Harris under 28 U.S.C. §§ 1331 and 1343.  This Court has subject matter jurisdiction of the claims against Kelmar under 28 U.S.C. §§ 1332(a)(2) and 1367.

11.      A substantial part of the events or omissions giving rise to the claims here at issue occurred in this District.  Because the property seized by the Administrator is situated herein, venue is proper in this District under 28 U.S.C. § 1391(b)(2).

## PARTIES

12.      Plaintiff is a Chilean engineer and legal representative of the estate of Rene Correa Borquez ("Borquez").  All of the heirs of Borquez empowered Plaintiff under Chilean law to recover Borquez's property unlawfully seized by state governments in the United States.  Plaintiff has submitted the requisite claim, was paid, and is recognized by the State of New Jersey as the rightful legal representative to seek the return of the seized property belonging to Borquez.

13.     Defendant Muoio is the Treasurer of the State of New Jersey and is responsible for managing the State's financial resources and operations.  Defendant Muoio's headquarters is located at 125 West State Street, Trenton, New Jersey.

14.     Defendant Harris is the Administrator of the New Jersey Unclaimed Property Administration and is responsible for the enforcement and administration of the Act.  Defendant Harris's office is located at 50 West State Street, 6th Floor, Trenton, New Jersey.

15.     Defendant Kelmar provides administrative services to the State of New Jersey in connection with the NJUPA.  On information and belief, Kelmar is incorporated in Massachusetts and has its principal place of business at 500 Edgewater Drive Suite 525, Wakefield, MA 01880.

## ALLEGATIONS

### A.  Statutory Background of New Jersey's Unclaimed Property Act

16.     Traditionally, abandoned property or "escheatment" statutory schemes applied to real property and tangible personal property belonging to persons who died intestate with no descendent, relative, or other valid claimant to the estate.  In these situations, the property truly was abandoned and ownerless (*bona vacantia*).

17.     It was not until the mid-Twentieth Century that states such as New Jersey began to expand unclaimed property laws to include certain types of intangible property, including, in particular, unclaimed bank deposits and brokerage accounts.  State governments soon realized that unclaimed intangible property could represent a significant source of revenue for the state.

18.     The NJUPA departs from the historic function of abandoned property laws.  Instead of being limited to property owned by persons who have died intestate or disappeared, the statute applies to any property meeting the technical definition of "abandonment."  The Act does not use the traditional understanding of "abandonment" – *i.e.,* the knowing and voluntary "relinquishing of a right or interest of never reclaiming it."  Black's Law Dictionary (12th ed. 2024).  Moreover,

the NJUPA departs from its avowed statutory purpose of seeking to reunite owners with their lost property.

19.     Instead, the property is deemed "abandoned" under the Act according to certain dormancy thresholds specified in the statute.  As a general rule, property is presumed "abandoned" if it is dormant for one to five years with no activity by the owner.  *See, e.g.*, N.J. Stat. Ann. §§ 46:30B-28.1 to 46:30B-45.

20.     New Jersey uses a short, three-year "dormancy" period to determine whether a securities account may be deemed dormant and, therefore, "abandoned."  N.J. Stat. Ann. § 46:30B-7 (generally "all property, including any income or increment derived therefrom, less any lawful charges, whether located in this State or another state, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned").  Thus, if an account is inactive for three years – for example, if a customer is using a buy-and-hold approach to investment, makes no deposits or withdrawals, receives no dividends (which is not uncommon for many "blue chip" stocks) for three years – the account can be listed as "abandoned."  This three-year rule applies to checks, certified checks, credit memos, dividends, money orders, savings accounts, non-governmental bonds, traveler's checks, shares, bonds, commissions, and all other intangible property.

21.     The NJUPA requires that financial institutions and other entities holding so-called "abandoned" property transfer it to the New Jersey State Unclaimed Property Administration (the "Administration"), led by the Administrator.  Such property includes supposedly "dormant" stock and bond accounts, savings accounts, uncashed payroll checks, unredeemed customer or vendor credits, and unused gift cards or gift certificates.

22.     Telephone calls or verbal contact with an owner do not by themselves prevent property from being deemed "abandoned."  Nor does internal activity such as service charges, crediting of interest and dividends, automatic dividend reinvestment, and automatic withdrawals prevent property from being deemed abandoned.

23.     As part of the State's relentless campaign to fill its coffers with "abandoned" property, the Act contains strong penalties coercing property holders, including banks and other entities, to report as much "abandoned" property as possible to the Administration.  Such entities are required, subject to severe penalties, to submit "holder reports" annually to the Administration listing all "abandoned" property they hold.  Such reports must include details on the property and remittance to the Administration of the escheated property.

24.      Starting in the late 1990s and continuing into the early 2000s, New Jersey and other States dramatically increased their enforcement efforts.  This surge in audit activity was largely due to the proliferation of private contract audit firms compensated by the states on a contingent-fee basis – typically, 10 to 15 percent of any unclaimed property identified in the audit.  Such a fee structure provides a profit incentive to such firms to take aggressive positions in these audits.  Further, these contingent-fee audit firms are often staffed by former accountants and consultants with far greater expertise in unclaimed property matters than their client states, which led many states to defer almost entirely to the positions taken by these firms in audits.

25.     Defendant Kelmar is the auditor for the State of New Jersey.  As alleged herein, Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.  This profit motive gives Kelmar an incentive to perform its duties negligently under the Statute.

26.     The use of contingent fee audits (which, of course, creates financial incentives for aggressive and unconstitutional seizures of property) is inconsistent with the stated purpose of unclaimed property laws, which is to return property to its rightful owner.  Thus, instead of protecting the rights of the "true owners," the Act represents a new form of escheatment that views unclaimed property law as a revenue generator for the State of New Jersey.

27.     As explained below, the NJUPA combines these aggressive definitions of "abandoned" and "unknown" with constitutionally inadequate notice to the true owners (which has the effect of further increasing state revenue).

**B. <u>NJUPA's Constitutionally Inadequate Pre-Deprivation Notice Procedures</u>**

28.     The NJUPA provides different amounts of notice depending on the commercial value of the property and where the property owner is located.

29.     For property in excess of $50, the holder of the property must send, by certified mail with return receipt requested, a written notice to the apparent owner at their last known address informing them that the holder will be turning over their property to the State of New Jersey.  N.J. Stat. Ann. § 46:30B-50.  This written notice must be sent at least 60 days before (but not more than 120 days before) filing the abandoned property report to the State.  *Id.*

30.     The NJUPA provides for individualized notice in only one form, a letter posted by certified mail.  *See* N.J. Stat. Ann. § 46:30B-50.  But the United States Postal Service only offers certified mail within the United States, apart from service to U.S. military and diplomatic installations.  Thus, the Act contain no individualized notice provision for individuals with addresses located outside the United States.  There is no provision in the NJUPA providing for notice to property owners who do not live in the United States.

31.     For property valued at $100 or more, the NJUPA provides for—in addition to the certified letter required by N.J. Stat. Ann. § 46:30B-50—the publication of the name and last

known addresses (if any) in a newspaper circulating in the New Jersey county of that last known address at least once per week for two consecutive weeks. Or "[i]f the address is outside this State, the notice shall be published in the county in which the holder of the property has its principal place of business within this State." N.J. Stat. Ann. § 46:30B-51. Thus, published notice is never provided outside the State of New Jersey, regardless of where the owner of the property resides or previously resided.

32.    Moreover, a resident of Chile (like Plaintiff) would have no access to local New Jersey newspapers, which are written in English, and no reason to look there to review publication notice. The newspaper notice under the NJUPA is meaningless to Plaintiff and other foreign property owners, as well as those in other states.

33.    For "abandoned" property valued at less than $50, the Act does not require banks and other financial services institutions to provide any notice at all to its rightful owner before transferring it to the Administration. N.J. Stat. Ann. § 46:30B-50.

34.    "Abandoned" property is then seized by the Administration under the supervision of the Administrator, who acts as property custodian. Property holders (such as financial services institutions) must transfer cash via checks or electronic funds transfers.

### C.  NJUPA's Constitutionally Inadequate Post-Deprivation Notice

35.    After property is transferred to the Administration, the Act continues to deny owners any meaningful notice, even after they have been deprived of their property. Such property may be transferred to the Administration without any individualized or published notice to its rightful owners.

36.    Under the NJUPA, "the state assumes custody and responsibility for the safekeeping of the property." N.J. Stat. Ann. § 46:30B-61. The Administrator manages an unclaimed property trust fund, which under the NJUPA is "administered and invested by the State

Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey."   N.J. Stat. Ann. § 46:30B-74(a).

37.     After the seizure, New Jersey places the owner's name and last known address on a searchable Internet website (https://unclaimedfunds.nj.gov/app/claim-search) that property owners may visit if they know it.  However, many property owners (like Plaintiff) are unaware of the website.  And the NJUPA does not require the State to post on the website a description of the property, the value of the property (or even a range of values), and other critical identifying information.

38.     The website fails to provide the constitutionally required prior notice ***before*** property is seized.  Such an approach to notice shifts the burden from government to the owners to ferret out the information on their property after it has been seized by the State.  Indeed, it defies common sense to expect out-of-state or foreign owners (like Plaintiff) to search a New Jersey website when they and their property have no nexus with New Jersey.

39.     Moreover, the website is rife with technical limitations.  It provides only a property ID, number, but not a description of the property, making it impossible for owners to know the nature or value of the property at issue, or when it was seized.  The website hides vital identifying information from the owner.

40.     In addition, it is especially difficult to reclaim property if the property is listed with last name first, if the name is misspelled or abbreviated, or if a nickname is used (such as "Bill" for "William" or "Dave" for "David"), or if the property is listed by the name of the institution holding it, rather than the individual owner.

41.     Further, the Administration may reject claims if, for example, it deems their supporting documentation inadequate based on the unpublished or verbal claims process.

Moreover, with no notice, many individuals are unaware that their property has been transferred to the Administration or of the procedure for seeking its return. Accordingly, property owners are highly unlikely to avail themselves of this procedure and, in fact, only a small portion of seized property is ever returned. Finally, as a practical matter, the private property is often sold or destroyed before this limited information is posted to the website.

42. After providing totally inadequate notice before property is seized, the Act provides "the administrator **shall**, within three years after the receipt of abandoned property, sell it to the highest bidder at public sale in whatever municipality in the state affords in the judgment of the administrator the most favorable market for the property involved." N.J. Stat. Ann. § 46:30B-69 (emphasis added). This section includes exceptions for property of sufficiently low value that sale would be, in the judgment of the administrator, unprofitable. *Id.* There is also a further requirement that notice of the sale be published "at least three weeks in advance of sale, in a newspaper of general circulation in the county in which the property is to be sold." *Id.* This notice requirement is directed at the location of the sale and is, in essence, no more than an advertisement of the State's sale.

43. The Act generally requires that seized property be held for at least one year before it may be sold. N.J. Stat. Ann. § 46:30B-71.[4] Thus, ordinarily, seized property will be sold at some point between one year and three years after it is seized.

---

[4] There is a significant carve out to the one-year hold requirement: the Administrator may sell a security before the one-year hold period expires if it "considers it to be in the best interest of the State to do otherwise." N.J. Stat. Ann. § 46:30B-71; *see also* N.J. Stat. Ann. § 46:30B-72 (including the same carve out for the sale of securities but providing a small exception allowing for payment of the value of sold securities at the time of the claim if a claim is made *during* the one-year period that the security should ordinarily have been held). This exception is so broad as to render the one-year hold requirement meaningless in terms of restrictive power. In this context, the best interest of the State could simply mean that it is an administrative burden to keep track of some number of securities.

44. The sales provision applies to all types of property, including securities. The Act requires that "[s]ecurities listed on an established stock exchange shall be sold at prices prevailing at the time of sale on the exchange. Other securities may be sold over the counter at prices prevailing at the time of sale or by any other method the administrator considers advisable." N.J. Stat. Ann. § 46:30B-70.

45. Obviously, the sale of securities is highly sensitive to the time of the sale. A sale at the wrong moment (let alone the wrong year) could mean a significant difference in realized profits. Under the Act, "[w]henever property other than money is paid or delivered to the administrator under this chapter, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion thereof into money." N.J. Stat. Ann. § 46:30B-68. But after the sale is complete, a successful claimant is entitled only to "the net proceeds of the sale," N.J. Stat. Ann. § 46:30B-79, and the NJUPA denies interest to the property owner after the sale or conversion of property by the State. *See id.; id.* at § 46:30B-68.

**D. <u>Judicial Concerns Regarding Unclaimed Property Laws</u>**

46. The NJUPA, along with unclaimed property laws in other states, has been trending in the wrong direction for over thirty years because such laws have been greatly expanded in unconstitutional ways to generate revenue for states, at the expense of both owners and putative holders of unclaimed property.

47. In 2016, two Justices of the U.S. Supreme Court – Justices Alito and Thomas – expressed constitutional concern about state abandoned property laws in a separate opinion concurring in the denial of certiorari in a case presenting the question whether unclaimed property laws "provide[] property owners with constitutionally sufficient notice before escheating their financial assets." *Taylor v. Yee*, ___ U.S. ___, 136 S. Ct. 929, 929 (2016). These Justices

explained that "[t]he Due Process Clause requires States to give adequate notice before seizing private property. When a State is required to give notice, it must do so through processes 'reasonably calculated' to reach the interested party – here, the property owner." *Id.* (citation omitted).

48.     In that case, Justices Alito and Thomas explained that because the seizure of private property is no small thing, notification procedures may not be empty rituals: "[P]rocess which is a mere gesture is not due process.' Whether the means and methods employed by a State to notify owners of a pending escheat meet the constitutional floor is an important question." *Id.* (citations omitted). The Justices noted that "[i]n recent years, States have shortened the periods during which property must lie dormant before being labeled abandoned and subject to seizure." *Id.* at 930. The Justices cited New York as an example and observed that it recently shortened its dormancy period from as long as 15 years to merely three years. *Id.* "This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns. As advances in technology make it easier and easier to identify and locate property owners, many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property. Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets. But they also have an obligation to return property when its owner can be located. To do that, States must employ notification procedures designed to provide the pre-escheat notice the Constitution requires." *Id.* These Justices concluded that "the constitutionality of current state escheat laws is a question that may merit review in a future case." *Id.*

49.     Judge Richard Posner of the Seventh Circuit Court of Appeals described a three-year dormancy period for determining abandonment as "a period so short as to present a serious

question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski v. Zoeller*, 735 F.3d 577, 582 (7th Cir. 2013).

50.     In *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that an injunction should be issued against California's Unclaimed Property law for violations of the U.S. Constitution similar to those alleged in this case. *Id.* at 1200–02.

**E.  New Jersey Seizes Borquez's Property Without Notice and Provides Inadequate Compensation**

51.     Borquez was a Chilean lawyer with many significant investments.  He died testate in Chile on May 27, 2006.  Borquez left the entirety of his estate to his brother, Hernan Correa Borquez, who also resided in Chile.

52.     Hernan Correa Borquez died testate in Chile.  His heirs all reside in the country of Chile.  Indeed, there is no nexus between the members of the Borquez family and the State of New Jersey.  No member of the Borquez family has ever resided in New Jersey.

53.     Plaintiff is the legal representative of the estate of Hernan Correa Borquez and, through him, of the estate of Borquez.  Plaintiff brings this suit on behalf of himself and the other heirs of Hernan Correa Borquez; through Hernan Correa Borquez, they are the heirs to Borquez and his significant investments.

54.     Borquez owned various stocks in financial services accounts across the United States.  His name and address in Chile were associated with all of the accounts, and it would have been practicable to give him and his heirs individualized notice as to the stocks he owned.

55.     Borquez owned property that was seized by the Administrator without notice.  For example, he purchased Exxon stock (later Exxon Mobil stock) that was seized by the Administrator:

| Date of Purchase | Number of shares | Number today after stock splits |
|---|---|---|
| July 22, 1977 | 100 | 1,600 |
| May 16, 1981 | 100 | 800 |
| August 14, 1987 | 200 | 1,600 |
| April 11, 1997 | 400 | 1,600 |
| March 13, 2000 | 105 | 210 |
| **Total** | 905 | 5,810 |

56.     Additional property may have been seized as well.  Neither Plaintiff, any heir, nor any other representative of Borquez's or his brother's estates received ***any*** notice that the Administration had seized the above property. No written notice was received pursuant to N.J. Stat. Ann. § 46:30B-50, nor was any published notice received pursuant to N.J. Stat. Ann. § 46:30B-51.  Had the Administrator provided Borquez or his heirs notice that she would seize the property, they could have acted to prevent that seizure.

57.     Plaintiff, as representative of all of the heirs of Borquez, contacted the Administrator requesting the return of the property.  Plaintiff provided the Administrator with complete documentation in support of the claim, including account information, proof of stock ownership, a copy of Borquez's Succession/Will, and the identification of each of his heirs. Plaintiff completed the claims process.

58.     By check dated November 8, 2023, Plaintiff received the sum of $487,581.23 from the Administrator regarding Borquez's Exxon Mobil stock. The final sum received by Plaintiff is grossly inadequate and reflects the unnoticed sale of Plaintiff's stock.  It does not include dividends or post-sale interest, fails to reflect the market value of the stock (approximately $603,000 as of

the November 8, 2023 opening price), and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the Administrator. The Administrator has refused to provide Plaintiff with adequate relief.

59.    Currently, Plaintiff and the Borquez family members own other stocks and property, such as bank accounts, that they do not wish to be subject to Defendants' unnoticed property seizure process. Yet Plaintiffs and Class Members have no way to protect themselves from the NJUPA as it currently operates to cause irreparable harm to the public.

60.    Plaintiff continues to suffer ongoing injury from the NJUPA. Plaintiff is the owner of and legal representative for additional other property potentially vulnerable to seizure and taking under the NJUPA. He is required to monitor that property continuously in order to ensure that the Administrator does not attempt to seize it. He is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States.

61.    The NJUPA deters Plaintiff from acquiring further property that might be subject to seizure under the NJUPA. Absent the NJUPA, Plaintiff would take concrete steps toward the acquisition of other property in the United States.

62.    Plaintiff's legal claims did not fully accrue until Plaintiff ultimately received the final sum from the Director.

63.    Plaintiff's extensive communications with Defendants tolled any applicable statute of limitations.

64.    Further, Defendants' acts, omissions, misrepresentations, and practices also tolled or equitably estopped any limitations period. Through such acts, omissions, misrepresentations, and practices, Defendants were able to conceal from Plaintiffs and Class the material facts

involving their property.  Even though Defendants were under common law and statutory duties, Defendants intentionally and/or negligently failed altogether to provide publication and direct mail notice to Plaintiffs and Class regarding the seizure of their private funds and property.  Based on Defendants' breach of their statutory and constitutional obligations to notify Plaintiffs (among other things), Defendants are estopped from asserting a statute of limitations and have waived any such defense.

## **CLASS ACTION ALLEGATIONS**

65.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of a class of all persons and entities owning purportedly "abandoned" property transferred to the Administrator under color of the Act within the applicable statute of limitations who were denied constitutionally adequate notice under the NJUPA because they did not reside in the United States, the value of the property at issue was less than $50, or for any other prescribed in the NJUPA as construed by Defendant.  Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

66.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

67.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

68.     Although the exact number, identity, and location of persons in the proposed Class is readily discernible based on the Administrator's records, upon information and belief, the number of members in the proposed Class will be more than 1,000 persons.  Therefore, those persons in the Class are so numerous that joinder of the entire proposed Class is impractical.

69.     Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

70.     The claims of the Plaintiff are typical of the claims of the other Class members in that the representative Plaintiff, like all Class members, has had property taken by the Administrator without constitutionally adequate notice. Plaintiff, like all Class members, has been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the taken property.  Further, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

71.     Plaintiff is a member of the proposed Class will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in complex litigation, including class actions involving issues identical or similar to those raised in this action. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class.

72.     There are questions of law and fact common to all members of the proposed Class, including whether the Administrator complied with the Takings Clause of the Fifth Amendment

and the Due Process Clause of the Fourteenth Amendment by seizing and taking Plaintiff's property without constitutionally required prior notice.

73.     In short, Plaintiff's claims are typical of those of the members of the proposed Class, who are subject to the same deprivations of their property and rights, and there is a well-defined commonality of interest in this case's questions of law and fact.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff and Class members have all suffered and will continue to suffer economic harm and damage as a result of the Administrator's unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

75.     The Administrator has acted in a uniform manner with respect to Plaintiff and Class members.  Because his duties to comply with the Constitution apply equally to each person in the proposed Class, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Administrator.

76.     Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of many of the individual Class members' claims (particularly those whose property was valued at less than $50), it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

77.    Class treatment in this Court will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication by providing common answers to the common questions of constitutionality that predominate in this action.

78.    Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because the Administrator has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Administrator's liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests.  Class-wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in the Administrator's discharge of his duties to administer the NJUPA in accordance with the Constitution. Defendant's actions and threatened actions deprived, are depriving, and will deprive Plaintiff and the members of the proposed Class of their constitutional rights on grounds generally applicable to all, thereby making appropriate declaratory and injunctive relief with regard to the proposed Class as a whole.

## FIRST CLAIM FOR RELIEF

**(Against Defendants Muoio and Harris; U.S. Const. Fourteenth Amendment § 1 - Due Process Clause: 42 U.S.C. § 1983)**

79.    The allegations set forth above are incorporated into this claim by reference as though set forth in full here.

80.    The Fourteenth Amendment, Section 1, of the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ."  A claim alleging violation(s) of this federal right may be brought under 42 U.S.C. § 1983.

81.     Under the color of law provided by the Act, Defendants have violated (and continue to violate) the Plaintiff's right to due process through the enforcement and administration of the Act by depriving him of his property without due process.

82.     In every instance that the Act allows the Administrator to seize property without notice, it allows the Administrator to violate the constitutional rights of Plaintiff and Class Members.  Therefore, the Act is facially unconstitutional.

83.     Neither the Plaintiff nor any other heirs of Borquez received notice that the Administration seized Borquez's property.

84.     Plaintiff, as well as the owners of existing property, have a constitutionally protected property interest in the private property that they own and that is seized by the State of New Jersey under the processes described herein.  Defendants deprived Plaintiff and other property owners of their constitutionally protected property interests by seizing their property without notice and due process.

85.     Plaintiff did not receive fair compensation or interest for the loss of property.  The recovery Plaintiff has received from the Administrator is grossly inadequate. It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

86.     Unless Defendants are enjoined from continuing to enforce and administer the Act, they will continue to violate the constitutional rights of Plaintiff and others.

87.     Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiffs and the Class members by the Fourteenth Amendment's Due Process Clause.

## SECOND CLAIM FOR RELIEF

**(Against Defendants Muoio and Harris; U.S. Const., Fifth Amendment - Takings Clause: 42 U.S.C. § 1983)**

88.     The allegations set forth above are incorporated into this claim by reference as though set forth in full.

89.     The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall . . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  The Fourteenth Amendment incorporates the Takings Clause and applies it to the State of New Jersey.  *See Chicago Burlington and Quincy R.R. v. City of Chicago*, 166 U.S. 226 (1897).  The Takings Clause is enforceable via an action brought under 42 U.S.C. § 1983.

90.     Under the color of law provided by the Act, Defendants have violated (and continues to violate) Plaintiff's right under the Fifth Amendment through their enforcement and administration of the Act by taking Plaintiff's property without just compensation.

91.     Plaintiff did not receive just compensation for the loss of his property.  The recovery Plaintiff has received from the Administrator is grossly inadequate.  It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

92.     Further, once a stock is liquidated, the Administrator fails to pay interest on the private property that is seized and taken, and the nonpayment of interest is itself a separate violation of the Takings Clause.

93.     Defendants are acting in the capacity of a private trustee and custodian of private funds.  Their unlawful takings of private property had no valid public use or purpose.

94.     Unless Defendants are enjoined from continuing to enforce and administer the Act, they will continue to violate the constitutional rights of Plaintiff and other Class Members for the foreseeable future.

95.     Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiffs and the Class members by the Fifth Amendment's Takings Clause.

**THIRD CLAIM FOR RELIEF**

**(Negligence Against Defendant Kelmar)**

96.     Defendant Kelmar had a duty to act reasonably to ensure that the property of Plaintiff and his predecessors in interest was not identified as "abandoned" under the NJUPA when it was not in fact "abandoned."

97.     Defendant Kelmar had a duty to act reasonably to ensure that Plaintiff and his predecessors in interest received timely and meaningful pre-deprivation notice before his property was seized and taken under the NJUPA.

98.     Defendant Kelmar had a further duty to act reasonably to ensure that Plaintiff and his predecessors in interest received timely and meaningful post-deprivation notice to enable him to timely recover his property after it was seized and taken under the NJUPA.

99.     Defendant Kelmar breached those duties. Plaintiff and his predecessors in interest received no notice at all before the property was unconstitutionally seized and taken by the Administrator under the NJUPA.

100.    Defendant Kelmar's breach proximately caused damage to Plaintiff.  The property would not have been seized if it had been properly identified as not "abandoned."  Plaintiff and his

predecessors in interest would have taken steps to prevent the seizure, taking, and liquidation of the property if they had received timely and meaningful pre-deprivation or post-deprivation notice.

101.    Defendant Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. Declaratory relief declaring that the enforcement and administration of the NJUPA against Plaintiff and the Class Members by the Defendants violate the Fifth and Fourteenth Amendments of the United States Constitution;

B. Injunctive relief enjoining the Defendants from enforcing or administering the NJUPA unconstitutionally against Plaintiff and Class Members;

C. Injunctive relief enjoining the Defendants from selling or disposing of property already seized under the DUPL or held by private auditors and holders under their direction and control;

D. Injunctive relief requiring an accounting by the Defendants to identify class members potentially entitled to individualized relief;

E. Injunctive relief requiring the Defendants to return the property belonging to each Plaintiff and Class Member or otherwise put them in the same position monetarily as they would have occupied if the property had not been seized and taken, with interest and with compensation for any appreciation in the value of the property since its seizure;

F. Compensatory and punitive damages against Defendant Kelmar;

G. Prejudgment and post-judgment interest;

25

H.  An award of attorney's fees and costs under 42 U.S.C. § 1988; and

I.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Respectfully Submitted,


DATED: December 19, 2024

WILENTZ, GOLDMAN & SPITZER, P.A.


By: /s/ Kevin P. Roddy
     KEVIN P. RODDY, ESQ. (NJSBA # 014802005

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq. (To Be Admitted *Pro Hac Vice*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone:  (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan Massey (To Be Admitted *Pro Hac Vice*)
Bret R. Vallacher (To Be Admitted *Pro Hac Vice*)
Matthew Layden (To Be Admitted *Pro Hac Vice*)
MASSEY & GAIL LLP
The Wharf
1000 Maine Avenue, S.W.
Suite 450
Washington, DC 20024
Telephone: (202) 652-4511

**Attorneys for Plaintiff**