Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile: (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
*(Pro Hac Vice Counsel)*
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiff Vial and Proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,

Plaintiff,

v.

ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION.

Defendants.

**AMENDED CLASS ACTION COMPLAINT**

**Case No.: 3:24-cv-11301**

Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), brings this proposed class action on behalf of himself individually, as legal representative of the heirs of Rene Correa Borquez, and as representative of a putative class of similarly situated individuals (the putative "Class") against Defendant Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Administrator"), 50 West State Street, Trenton, NJ, and Defendant Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, 125 West State Street, Trenton, NJ (collectively, "Defendants"), and hereby alleges as follows:

## INTRODUCTION

1. This proposed class action challenges the constitutionality of New Jersey's escheatment scheme set forth in the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.*, (hereinafter the "NJUPA" or the "Statute") and other rules set forth in unpublished manuals, rules, and practices, both as applied and on its face with respect to foreign property owners like Plaintiff, who systematically will not receive constitutionally adequate notice under the Statute prior to the seizure of their property.

2. The NJUPA's purported purpose is to reunite property that has been deemed "abandoned" in the custody of a business with its rightful owner. *See Mission Statement*, UNCLAIMED PROPERTY ADMINISTRATION, https://www.nj.gov/treasury/unclaimed-property/aboutunclaim.shtml#:~:text=The%20New%20Jersey%20Unclaimed%20Property,acts%20as%20a%20custodian%20until (last visited April 1, 2025) [Permalink: https://perma.cc/66D8-Q7CN] ("The [Unclaimed Property Administration's] goal is to return this property to the rightful owner and/or heirs.").

3. To be clear: In this lawsuit, Plaintiff does **not** challenge the ability of New Jersey, as sovereign, to escheat abandoned property as a general matter, so long as it satisfies constitutional requirements.

4. Rather, this lawsuit is aimed squarely at the ways in which the NJUPA has been weaponized (through both statutory design and implementation) to make such escheatment more frequent and reunification less likely for the purposes of generating revenue.

5. Every year, hundreds of thousands of properties are seized by New Jersey, but only a fraction of them are returned.[1]

6. The massive delta between seized property and returned property is a feature—not a bug. As a result of it, the Administrator of the State of New Jersey Unclaimed Property Administration ("UPA") currently holds **over $6 billion** in purportedly "unclaimed" property.[2] This supposedly "unclaimed" property is in fact owned by such famous persons as Bruce Springsteen, Sanda Bullock, Dennis Rodman, Governor Phil Murphy, and businesses associated with President Donald J. Trump. The State is purportedly unable to reunite these persons with the "unclaimed" property it has appropriated from them.

7. As the Third Circuit Court of Appeals has observed: "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than reunite abandoned property with its owners." *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017).

8. And as Justices Alito and Thomas have similarly observed: "Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016). However, "[i]n recent years, States have

---

[1] *See* New Jersey Dep't of Treasury, *Treasury News Release for August 21, 2023*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2023/08212023.shtml (last visited April 1, 2025) [Permalink: https://perma.cc/PHJ7-ZJG6] ("A total of 236,845 records that were reported to the State in the past year" but there were only "73,686 claims filed with the agency.").

[2] *See* New Jersey Dep't of Treasury, *Treasury News Release for August 21, 2023*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2023/08212023.shtml (last visited April 1, 2025) [Permalink: https://perma.cc/PHJ7-ZJG6].

shortened the periods during which property must lie dormant before being labeled abandoned and subject to seizure." *Id*. The Justices cited New York as an example and observed that it recently shortened its dormancy period from as long as 15 years to merely three years. *Id.*[3]

9. The Justices further observed that states were "combining shortened escheat periods with minimal notification procedures" in such a way that "raises important due process concerns." *Id.* Specifically, these Justices explained that the Due Process Clause imposes a "constitutional obligation" on the states "to **provide adequate notice before escheating private property**." *Id.* (emphasis added). They further explained that "[w]hen a State is required to give notice, it must do so through processes 'reasonably calculated' to reach the interested party – here, the property owner." *Id.* (citation omitted). "[P]rocess which is a mere gesture is not due process," but rather states "must employ notification procedures designed to provide the **pre-escheat notice** the Constitution requires." *Id.* (emphasis added).

10. In *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that a district court abused its discretion in failing to issue an injunction against California's Unclaimed Property Law for violating the U.S. Constitution in ways similar to those alleged in this case. *Id.* at 1200–02.

11. In fact, the NJUPA is generally considered to be one of the nation's most aggressive abandoned property statutes. The Council on State Taxation ("COST") graded all 50 states based

---

[3] Judge Richard Posner of the Seventh Circuit Court of Appeals similarly described a three-year dormancy period for determining abandonment as "a period so short as to present a serious question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski v. Zoeller*, 735 F.3d 577, 582 (7th Cir. 2013).

on the aggressiveness of their abandoned property laws. New Jersey, along with California and Louisiana, received the COST's ***lowest*** grade: a "D."[4]

12. In accordance with the constitutional issues identified by Justices Alito and Thomas, Judge Posner, and other jurists, Plaintiff simply asks the Court to require New Jersey to provide constitutionally "adequate notice **before** escheating private property," *Taylor*, 136 S. Ct. at 930, as well as restore Plaintiff (and the putative class) to the positions they would have been but-for New Jersey's unconstitutional actions.

13. Plaintiff is a citizen and resident of Chile who received **no notice at all** before his (and his family's) Exxon Mobil shares were seized and taken by Defendants under the NJUPA.

14. The State of New Jersey does not provide direct mail notice or any individualized notice whatsoever to property owners alerting them that the State is seizing their property.

15. Rather the State's pre-deprivation notice obligation has been delegated to holders of property (banks, brokerages, etc.). However, even the holders' notice obligation **categorically exempts notice** for property owners living outside of the United States, or its military and diplomatic installations (such as Plaintiff).

16. Specifically, NJUPA requires holders to provide notice by certified mail, N.J. Stat. Ann. § 46:30B-50. However, the United States Postal Service does not offer certified mail outside of the United States (apart from service to U.S. military and diplomatic installations).[5]

---

[4] Douglas L. Lindholm and Ferdinand S. Hogroian, *The Best and Worst of State Unclaimed Property Laws: Cost Scorecard on State Unclaimed Property Statutes*, COUNCIL ON STATE TAXATION, https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf (last accessed on March 9, 2025).

[5] *See* United States Postal Service, *Certified Mail® - The Basics*, WWW.USPS.COM, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image] ("Certified Mail items may be sent to

Accordingly, neither the State nor holders provide direct mail notice, or any individualized notice, to overseas property owners alerting them that their property has been deemed "abandoned" and is subject to seizure by the State.

17. The only notice provided by New Jersey to property owners is in the form of newspaper publication inserts—however, those are **published only in local New Jersey newspapers, and only *after* the property has been escheated**. *See* N.J. Stat. Ann. § 46:30B-51. Out-of-state property owners such as Plaintiff (who is a resident of Chile) would have no practicable access to such local New Jersey newspaper notice. But even for property owners who did happen across a newspaper notice, they could not glean from it the nature of the seized property or even its value because the newspaper inserts listed only names (sometimes misspelled, partial, or omitted entirely) and partial addresses of property owners.

18. For years, the Borquez Family (directly and through agents) have been diligently working to determine which states in the United States seized their property, and to secure that property. Plaintiff contacted the Administrator in an attempt to recover the property seized and taken by the State, but after much delay, the Administrator provided Plaintiff with only a fraction of the property's actual value on November 8, 2023.

19. As explained in Section D below, but for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned. But the Administrator refuses to make Plaintiff whole for this constitutionally-deficient seizure.

---

U.S. possessions and territories"); *id.* ("Certified Mail is not available with International mail but may be mailed to APO (Army Post Office), FPO (Fleet Post Office), and DPO (Diplomatic Post office) locations").

20. Plaintiff has not only lost over a hundred thousand dollars from New Jersey's no-notice escheatment of his family's stocks, but he remains at risk of other of his securities being escheated without notice under the NJUPA. For example, in an attempt to begin repurchasing some of the property that New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil through a brokerage called TradeUp Securities (incorporated in New Jersey). These stocks are subject to escheatment in New Jersey (just like they were the last time they were seized). Plaintiff plans to pursue a buy-and-hold strategy regarding these stocks, meaning he plans to do nothing else with them or the brokerage account, including by allowing any dividends to accrue in the account without re-investing them (automatically or otherwise). Accordingly, absent injunctive relief from this Court, they will be escheated by New Jersey. And because he lives outside the delivery area for certified mail, they will be escheated without notice once more.

21. Because the NJUPA is unconstitutional both as applied and on its face with respect to the category of persons (like Plaintiff) who received no notice prior to the seizure of their property, Plaintiff brings this action to secure prospective relief, requiring the state to "employ notification procedures designed to provide the **pre-escheat notice** the Constitution requires," *Taylor*, 136 S. Ct. at 930, and requiring Defendants to return the property belonging to each Plaintiff and Class Member, or otherwise put them in the same position as they would have occupied if the property had not been unconstitutionally seized and taken by the Administrator.

## JURISDICTION AND VENUE

22. This action is brought under 42 U.S.C. § 1983 and alleges that the Defendants violated, and will continue to violate, the constitutional rights of Plaintiff and all other similarly situated persons under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment (incorporated against the states under the Fourteenth Amendment). This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

23. A substantial part of the events or omissions giving rise to the claims here at issue occurred in this District. The property seized by the Administrator is situated herein. Therefore, venue is proper in this District under 28 U.S.C. § 1391(b)(2).

## PARTIES

24. Plaintiff Jaime Vial is a Chilean engineer and legal representative of the estate of Rene Correa Borquez. All the heirs of Mr. Borquez empowered Plaintiff Vial under Chilean law to recover Mr. Borquez's property unlawfully seized by state governments in the United States. Plaintiff Vial submitted the requisite claims, was paid, and is recognized by the State as the rightful legal representative to seek the return of the seized property belonging to Rene Correa Borquez. Jamie Vial is also the owner of shares of Exxon Mobil via a brokerage called TradeUp Securities (incorporated in New Jersey), which are at risk of escheatment under the Act.

25. Defendant Muoio is the Treasurer of the State of New Jersey and is responsible for managing the State's financial resources and operations. Defendant Muoio's headquarters is located at 125 West State Street, Trenton, New Jersey.

26. Defendant Harris is the Administrator of the New Jersey Unclaimed Property Administration and is responsible for the enforcement and administration of the Act. Defendant Harris's office is located at 50 West State Street, 6th Floor, Trenton, New Jersey.

## FACTUAL ALLEGATIONS

### A. Background on New Jersey's Unclaimed Property Act

27. Traditionally, abandoned property or "escheatment" statutory schemes applied to real property and tangible personal property belonging to persons who died intestate with no descendent, relative, or other valid claimant to the estate. In these situations, the property truly was abandoned and ownerless (*bona vacantia*).

28. It was not until the mid-twentieth century that states such as New Jersey began to expand unclaimed property laws to include certain types of intangible property, including unclaimed bank deposits and brokerage accounts. State governments soon realized that unclaimed intangible property could represent a significant source of revenue for the state.

29. Unclaimed property liquidations generate **hundreds of millions** in revenue for New Jersey every year. The State currently has over **$6 billion** in supposedly "unclaimed" property. Simply put, a staggering amount of private property is being seized, liquidated, and employed for public use.

30. Between fiscal years 2022–2024, the State has had to return approximately $628.48 million—which was the result of 233,734 successful claims from property owners seeking to claw back their properties. Since the inception of the program, it has returned more than $2.7 billion in property that had not in fact been abandoned.[6]

31. The NJUPA requires every business doing business in New Jersey—including banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J. Stat. Ann. §§ 46:30B-46; 46:30B-57.[7]

---

[6] *See* New Jersey Department of the Treasury, *July 30, 2024 Press Release*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2024/07302024.shtml#:~:text=(TRENTON)%20%2D%20For%20the%20third,claims%20paid%20by%20the%20agency (last accessed April 15, 2025) [Permalink: https://perma.cc/C246-4LFJ].

[7] In its public messaging to holders regarding their obligations, the "State of New Jersey's Unclaimed Property Administration (UPA) would like to remind **all businesses with an operating presence in the State of New Jersey** of their obligation to report abandoned or unclaimed funds to the UPA." *See* Holder Reporting Reminder, New Jersey Unclaimed Property, https://www.nj.gov/treasury/unclaimed-property/pdf/HolderReportingReminder.pdf (last accessed April 25, 2025) [Permalink: https://perma.cc/ZRN6-7ST7]. While the Act does not use the phrase "doing business in New Jersey" as such, that is its reach. *See* N.J. Stat. Ann. §§ 46:30B-46 (requiring any holder with property subject to custody under the Act to submit a report to the

32. The NJUPA does not use the traditional understanding of "abandonment," i.e., the "relinquishing of a right or interest with the intention of never reclaiming it." Abandonment Definition, Black's Law Dictionary (12th ed. 2024), *available* at Westlaw. Instead, different types of property—ranging from contents of safe-deposit boxes to stocks, retirement accounts, pension plans, savings accounts, wages, refunds, deposits, and gift cards—are presumed "abandoned" under the Act according to certain dormancy thresholds specified in the statute.

33. New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore, "abandoned." N.J. Stat. Ann. § 46:30B-7 (generally "all property, including any income or increment derived therefrom, less any lawful charges, whether located in this State or another state, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned").

34. The same period applies to securities. *See* N.J. Stat. Ann. § 46:30B-31 (Presumption of Abandonment for "[s]tock or other interest in a business association).[8] Thus, if an account is

---

Administrator); N.J. Stat. Ann. §§ 46:30B-10 (showing conditions required to property to be subject to custody, including a last known address in New Jersey or the holder being domiciled in New Jersey). Thus, any business that holds the property of someone with a New Jersey address, or last known address in New Jersey, or an unknown or foreign address where the holder is domiciled in New Jersey, is subject to the requirements of the NJUPA.

[8] The NJUPA section on the dormancy period for the escheatment of securities states:

> Stock or other interest in a business association, including a debt obligation other than a bearer bond or original issue discount bond, is presumed abandoned: three years after the earlier of the date of an unpresented instrument issued to pay interest or a dividend or other cash distribution, or the date of issue of an undelivered stock certificate issued as a stock dividend, split, or other distribution; or if a dividend or other distribution has not been paid on the stock or other interest for three consecutive years, or the stock or other interest is held pursuant to a plan that provides for the automatic reinvestment of dividends or other distributions, three years after the date of the second mailing of a statement of account or other

inactive for three years—for example, if a customer is using a buy-and-hold approach to investment, makes no deposits or withdrawals, receives no dividends (which is not uncommon for many "blue chip" stocks) for three years—the contents of the account are subject to escheatment to the Administrator. *See id.* This three-year period also applies to checks, certified checks, credit memos, dividends, money orders, savings accounts, non-governmental bonds, traveler's checks, shares, bonds, commissions, and all other intangible property.[9]

35. In essence, the three-year period runs from the holder's last interaction with the apparent owner. If a stockowner goes three years without making a written communication concerning the property or account, or "by other means reflected in a contemporaneous record," or a presentment of an instrument of payment, or other activity in the account (like a deposit or withdrawal), *see* N.J. Stat. Ann. § 46:30B-7.1, the period runs. Telephone calls or verbal contact with an owner do not by themselves prevent property from being deemed "abandoned." *See* N.J. Stat. Ann. § 46:30B-7.1. Nor does internal activity such as service charges prevent property from being deemed abandoned. *See id.*

36. Indeed, in the case of an account that automatically reinvests dividends or other distributions, the Act calls for escheatment either after two statements or other notifications have been returned as undeliverable or "three years . . . after the holder discontinued mailings to the apparent owner." N.J. Stat. Ann. § 46:30B-31. This provision has the potential to leave the terms of escheatment entirely in the hands of the holder and its policies on account communications.

---

> notification or communication that was returned as undeliverable, or after the holder discontinued mailings to the apparent owner, whichever is earlier.

N.J. Stat. Ann. § 46:30B-31.

[9] There are various presumptions for other forms of property. *See* N.J. Stat. Ann. §§ 46:30B-28.1 – 46:30B-45.

37. In sum, if an account is not active in the ways specified in the NJUPA for three years—for example, if a customer is using a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years—the account would be deemed "abandoned" and the holder must report it and send it to the State.

38. As part of the State's relentless campaign to fill its coffers with "abandoned" property, the NJUPA contains strong penalties coercing property holders, including financial institutions, to escheat as much "abandoned" property as possible to the UPA. *See, e.g.*, N.J. Stat. Ann. § 46:30B-103 (failure to timely deliver property to the Administrator subjects holder to a penalty interest rate of 10 percent above the annual rate of discount); N.J. Stat. Ann. § 46:30B-104 (failure to timely remit payment, property, or the report to Administrator is subject to "a civil penalty of $200 for each day the report, payment, or delivery is withheld, or the duty is not performed, up to a maximum of $100,000" in addition to the interest owed under § 46:30B-103); N.J. Stat. Ann. § 46:30B-105 (*willful* failure to remit payment, property, or the report subjects the holder to "a penalty of $1,000 for each day the report, payment, or delivery is withheld, or the duty is not performed, up to a maximum of $250,000, plus 25% of the value of any property that should have been but was not reported" in addition to the interest owed under § 46:30B-103).

39. These penalties pose a real risk to any holder who would otherwise err on the side of retaining the property. Starting in the late 1990s, States like New Jersey dramatically increased their enforcement efforts by hiring private contract firms to audit holders. These audit firms are compensated on a contingent-fee basis—typically, 10 to 15 percent of any unclaimed property seized. (Fees for the seizure of property are paid not by the individual property owner but by other property owners under the NJUPA.) Such a fee structure provides a profit incentive to auditors to

aggressively seize as much property as possible and to minimize the provision of notice that would enable private owners to prevent seizure of their property.

40. At the same time, the holder is immunized for escheating the property. *See* N.J. Stat. Ann. §§ 46:30B-60.1–61.

41. As a result of these incentives, holders are much more likely to escheat property even if it is questionable or borderline (for which they will be immunized)—or else they would face stiff penalties following an aggressive audit.

42. Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J. Stat. Ann. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J. Stat. Ann. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration).

43. Under the NJUPA, "the state assumes custody and responsibility for the safekeeping of the property." N.J. Stat. Ann. § 46:30B-61.

44. After property is seized, the Act provides that "the administrator shall, within three years after the receipt of abandoned property, sell it to the highest bidder at public sale in whatever municipality in the state affords in the judgment of the administrator the most favorable market for the property involved." N.J. Stat. Ann. § 46:30B-69 (emphasis added). This section includes exceptions for property of sufficiently low value that the sale would be, in the judgment of the administrator, unprofitable. *Id.* There is also a further requirement that notice of the sale be published "at least three weeks in advance of sale, in a newspaper of general circulation in the county in which the property is to be sold." *Id.*

45. Securities are treated somewhat differently in that they may be sold "on an established stock exchange," as opposed to in a public sale. N.J. Stat. Ann. § 46:30B-70. In

addition, the Act generally requires that seized securities be held for at least one year before it may be sold. N.J. Stat. Ann. § 46:30B-71.

46. However, there is a significant carve out to the one-year hold requirement: the Administrator may sell a security before the one-year hold period expires if it "considers it to be in the best interest of the State to do otherwise." N.J. Stat. Ann. § 46:30B-71; *see also* N.J. Stat. Ann. § 46:30B-72 (including the same carve out for the sale of securities but providing a small exception allowing for payment of the value of sold securities at the time of the claim if a claim is made during the one-year period that the security should ordinarily have been held). This exception is so broad as to render the one-year hold requirement meaningless in terms of restrictive power. In this context, the best interest of the State could simply mean that it is an administrative burden to keep track of some number of securities.

47. The sales provision applies to all types of property, including securities. The Act further requires that "[s]ecurities listed on an established stock exchange shall be sold at prices prevailing at the time of sale on the exchange. Other securities may be sold over the counter at prices prevailing at the time of sale or by any other method the administrator considers advisable." N.J. Stat. Ann. § 46:30B-70.

48. The value of securities is highly dependent on the time of the sale. A sale at the wrong moment (let alone the wrong year) could mean a significant difference in realized profits. Under the Act, "[w]henever property other than money is paid or delivered to the administrator under this chapter, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion thereof into money." N.J. Stat. Ann. § 46:30B-68. But after the sale is complete, a successful claimant is entitled only to the net proceeds of the sale plus certain interest at a rate set by the

Administrator, N.J. Stat. Ann. § 46:30B-79. That is to say, the amounts that would have accrued to the owner of a security but for the intervention of the Administrator (whether appreciation or dividends) are lost after the security is sold.

49. The NJUPA provides owners no compensation for the appreciation in the property's value that would have inured to the owner but for the State's involvement. When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, the right to vote his or her shares in important matters of corporate governance, or the ability to sell the securities. Despite depriving owners of these rights associated with stock ownership, NJUPA provides no compensation for the deprivation of these rights.

50. The escheated property, once converted into cash, is deposited into a trust fund. The Administrator manages the unclaimed property trust fund, which under the NJUPA is "administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J. Stat. Ann. § 46:30B-74(c).

51. Despite the custodial framework of the fund, the NJUPA permits the State to use unclaimed property for public purposes. *See* N.J. Stat. Ann. § 46:30B-74(a)–(c) (permitting transfer of 75% of all escheated funds to the General State Fund).[10] As the NJUPA makes clear, seventy-five percent of the money that is deposited in the various unclaimed property trust funds is put to public use in the General State Fund. *See id.*

---

[10] Abandoned child support funds are deposited into the Unclaimed Child Support Trust Fund and are handled differently. *See generally* N.J. Stat. Ann. § 46:30B-74(d).

52. In theory, claimants may submit claim forms seeking the return of certain types of property by mail or online. However, only a small portion of seized property is ever returned. As explained in Sections B and C below, however, the NJUPA "combin[es the above] shortened escheat periods with minimal notification procedures" in such a way that "raises important due process concerns," *Taylor*, 136 S. Ct. at 930—which has the intended effect of reducing the likelihood of reuniting seized properties with their owners.

**B. NJUPA's Pre-Deprivation Notice Is Constitutionally Inadequate**

53. The Due Process Clause of the Constitution requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" before they are deprived of property. *Mullane*, 339 U.S. at 314.

54. The NJUPA also subjects to escheatment the assets of holders that are domiciled in New Jersey under certain circumstances. N.J. Stat. Ann. § 46:30B-10(c). However, most people do not know, for example, if the company that issued them shares happens to be domiciled in New Jersey. Moreover, whether a company is domiciled in New Jersey is a fact that can change without notice. As a result, owners living outside of New Jersey would have no reason to suspect that their shares would be sent to the Administrator and liquidated. But even with this surprisingly long reach, NJUPA does not provide reasonable efforts to provide owners notice before New Jersey seizes their property.

55. The NJUPA provides different levels of notice depending on the commercial value of the property and where its owner is located.

56. The State of New Jersey does not provide direct mail notice or any individualized notice whatsoever to property owners alerting them that the State is seizing their property.

57. For "abandoned" property valued at less than $50, the Act does not require the State or holders to provide any notice at all to its rightful owner before transferring it to the Administration, and the State itself provides no notice under any circumstances. *See* N.J. Stat. Ann. § 46:30B-50.

58. For property in excess of $50, the **holder** of the property must send, by certified mail with return receipt requested, a written notice to the apparent owner at their last known address informing them that the holder will be turning over their property to the State of New Jersey. N.J. Stat. Ann. § 46:30B-50. The holder is relieved from this requirement if the claim of the apparent owner is barred by the applicable statute of limitations or if the holder "has in its records an address for the apparent owner" which those same records "disclose to be inaccurate." *Id.*

59. This written notice must be sent at least 60 days before (but not more than 120 days before) the filing of the holder's abandoned property report with the State. *Id.* Accordingly, even where notice is sent and received, property owners are guaranteed just a couple of months to receive this notice and attempt to prevent their property from being escheated.

60. Although NJUPA imposes this requirement on the holder the State neither enforces it nor assists with it;[11] and frequently the result is no pre-deprivation notice whatsoever. *See generally* N.J. Stat. Ann. §§ 46:30B-50–51. Crucially, by removing the State—with its superior resources and databases rife with contact information of various owners—from involvement in this notice process, NJUPA has deliberately deviated from a process "'reasonably calculated' to reach the interested party—here, the property owner," *Taylor*, 136 S. Ct. at 930.

---

[11] In fact, the NJUPA relieves holders of all liability with respect to the delivered property once property is transferred to the Administrator. *See* N.J. Stat. Ann. § 46:30B-61.

61. More importantly, NJUPA provides for individualized notice in only one form: a letter posted by certified mail. *See* N.J. Stat. Ann. § 46:30B-50. But the United States Postal Service only offers the product Certified Mail within the United States (apart from service to U.S. military and diplomatic installations).[12]

62. Thus, the Act contains no individualized notice provision that is even possible (much less "reasonably calculated") to reach individuals (like Plaintiff) with addresses located outside of the United States.

63. The State simply takes the property in question without any individual notice, N.J. Stat. Ann. §§ 46:30B-50.1–52—in direct contravention of the *Mullane* Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property, 339 U.S. at 314.

**C. <u>NJUPA's Post-Deprivation Notice Is Constitutionally Inadequate</u>**

64. The NJUPA continues to deny owners meaningful notice, even after their property has been seized.

65. For property valued at $100 or more, NJUPA provides for dense, lengthy newspaper publication inserts that were **<u>published only in local New Jersey newspapers—and only after the property had been escheated</u>**. *See* N.J. Stat. Ann. § 46:30B-51 (for property other than that reported by life insurance companies, the Act requires the Administrator "cause a notice to be published not later than November 30 of the year next following the year in which abandoned

[12] *See* United States Postal Service, *Certified Mail® - The Basics*, www.usps.com, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image] ("Certified Mail is not available with International mail but may be mailed to APO (Army Post Office), FPO (Fleet Post Office), and DPO (Diplomatic Post office) locations").

property has been paid or delivered to the administrator"); N.J. Stat. Ann. § 46:30B-53 (published notice is only required for property valued at $100 or more).

66. Published notice is *never* provided outside the State of New Jersey, regardless of where the owner of the property is believed to have resided. *See* N.J. Stat. Ann. § 46:30B-51 (notice must be published in a newspaper circulating in the New Jersey county of that last known address or "[i]f the address is outside this State, the notice shall be published in the county in which the holder of the property has its principal place of business within this State").

67. An out-of-state resident, let alone a foreign resident (like Plaintiff), would have no access to local New Jersey newspapers and no reason to look there to review published notice. Thus, the newspaper notice under the NJUPA is meaningless to Plaintiff and other property owners residing out-of-state. Notice published in local New Jersey newspapers is in no way "'reasonably calculated' to reach the interested party – here, the property owner," *Taylor*, 136 S. Ct. at 930. But even for property owners who did happen across a newspaper notice, they could not glean from it the nature of the seized property or even its value because the newspaper inserts listed only names and addresses of property owners. *See* N.J. Stat. Ann. § 46:30B-52.

68. The Act states that published notice is *not* required for property valued at "less than $100 unless the administrator considers their publication to be in the public interest." N.J. Stat. Ann. § 46:30B-53. Because published notice is the only post-deprivation notice the NJUPA requires, there is effectively no post-deprivation notice at all for property valued at less than $100.

69. After the seizure, New Jersey places the owner's name and last known address on a purportedly searchable Internet website (https://unclaimedfunds.nj.gov/app/claim-search) that property owners may visit, if they are aware of its existence. But it defies common sense to expect

out-of-state or foreign owners (like Plaintiff) to search a New Jersey website when they and their property have no nexus with New Jersey.

70. But *even if* owners know to search for their property in New Jersey, and *even if* their property is posted, finding property on the website is *still* hobbled by the website itself in multiple ways.

71. First, NJUPA does not require the State to post the value of the property on the website (or even a range of values)—rather the Administrator need not post any information other than names and last known address identifiers of persons appearing from the records. *See* N.J. Stat. Ann. § 46:30B-76.1. Accordingly, owners could not glean from the website the nature of the seized property, from what entity it was seized, when it was seized, nor even a vague idea of its value.

72. Second, the website frequently contains partial names and facially incomplete address information. For just one example, one owner is listed as "John John" (third from the top, below, along with many other John Johns) with no last name and an address that simply states, "John" in the city of Hackensack. The only information that can be gleaned from this entry is that someone named John, who may have once resided in Hackensack, has some unclaimed property held by the state.

| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | JOHN JOHN | | 30 SMRDL ST | SPOTSWOOD | 08884 | 39518338 |
| CLAIM | JOHN JOHN | | 127 WOTSON | AVE | 07018 | 1101637 |
| CLAIM | JOHN JOHN | | JOHN | HACKENSACK | 07601 | 14978358 |
| CLAIM | JOHN JOHN | | 527 MARION ST | TEANECK | 07666 | 27837148 |

73. On information and belief, the Unclaimed Property website information is not cross-referenced against owner information in any of the State's databases. That might have been helpful to owners such as "John John" of "Hackensack."

74. And it might have been helpful to "Athan Jon," whose entry has no real name nor any address information whatsoever. Other information in the records of the holder, or the State, could illuminate who this person (presumably named Jonathan) is and where his property could be returned.

| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | ATHAN JON | | NONE | NONE | NOZIP | 31282472 |

75. On information and belief, at least hundreds of thousands of properties will never be claimed by their rightful owners because there is no way to discern who the rightful owner is from the website.

76. It is especially difficult to reclaim property if the property is listed with the first name in place of a last name, or if the name is misspelled or abbreviated, or if a nickname is used. See the two screenshotted entries below in which the name "Jose" is the only name provided, and, presumably, the owner's last name is listed as the street address (no actual street address appears).

| | | | | | | |
|---|---|---|---|---|---|---|
| CLAIM | JOSE JOSE | | RAMOS | PASSAIC | 07055 | 16986730 |

| | | | | | | |
|---|---|---|---|---|---|---|
| CLAIM | JOSE | | GRAY | PATERSON | 07501 | 34549209 |

77. It is even more difficult—if not impossible—to reclaim property that is erroneously listed by the name of the institution holding it, rather than the individual owner. Yet, this also happens with great frequency. The screenshotted examples below are representative of the problem (the Washington Boulevard addresses in Jersey City are JP Morgan corporate offices).

| | | | | | | |
|---|---|---|---|---|---|---|
| CLAIM | MORGAN JP | | 575 WASHINGTON BLVD FL 9 | JERSY CITY | 07310 | 22444730 |

| | | | | | | |
|---|---|---|---|---|---|---|
| CLAIM | MORGAN BROKER DEA JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850339 |
| CLAIM | MORGAN BROKER DEA JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850334 |
| CLAIM | MORGAN CHASE BANK JP | | 121 WOOD CREST ROAD | CHERRY HILL | 08003 | 41104531 |
| CLAIM | MORGAN CHASE BANK JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850340 |
| CLAIM | ARA AT JP MORGAN CHASE | | 130 BELMONT DR | SOMERSET | 08873 | 19813242 |

| | | | | | | |
|---|---|---|---|---|---|---|
| CLAIM | CHASE BANK NA JP MORGAN M | | PO BOX 47020 | DORAVILLE | 30362 | 20299758 |
| CLAIM | CO JP MORGAN CHASE BANK NA | | PO BOX 50000 DEPT 6583 | NEWARK | 07101 | 33293606 |

78. Although, in theory, claimants may submit claim forms seeking the return of certain types of property by mail or online, it is difficult or impossible for owners to reclaim their property because key identifying information is unavailable on the website, and because the Administrator fails to verify owner information with the other State of New Jersey databases.

79. In addition to these errors, there are a variety of foreign addresses that appear on the website. These individuals are obviously not domiciled in New Jersey and would have no reason to assume their property had been escheated to the state.

80. Instead of consulting its own databases—or using common sense—to screen for and correct obviously erroneous addresses (such as "Los Angeles, United Kingdom"), the State does nothing, allowing it to keep their property.

| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | EDWARDS JOHN M | | 16 GUINEVERE WAY EXETER EX4 8L | UNITED KINGDOM | 08540 | 18223061 |
| CLAIM | JOHN WHITEBROOK | MARKEY J WHITEBROOK | 81 WESTERN ROAD | LONDON UNITED KINGDOM | 00000 | 33903184 |
| CLAIM | MARTIN JOHN | MARTIN BARBARA E | BEEHIVE COTTAGE NEW ROAD | BLAKENEY UNITED KINGDOM | 07090 | 21313104 |
| CLAIM | JOHN ROBERTSON | | WELLERS PLACE FARM HOLT END LA | BENTWORTH UNITED KINGD | 00000 | 38574073 |
| CLAIM | JOHN M CLEESE | | 125 S BARRINGTON PLACE | LOS ANGELES UNITED KING | 90049 | 33901983 |

81. Because of NJUPA's framework for distributing notice, no one with a foreign address will have received any pre or post-deprivation notice. *See generally* N.J. Stat. Ann. § 46:30B-50–52.

82. Failing to verify names and addresses in any way is akin to a government officer who has "prepared a stack of letters to mail [and] handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain." *Jones v. Flowers*, 547 U.S. 220, 229 (2006). In that scenario, "one would certainly expect the [officer] to prepare a new stack of letters and send them again." *Id.* After all, no one "desirous of actually informing the owners would simply shrug his shoulders as the letters disappeared and say 'I tried.'" *Id.* "Failure to follow up would be unreasonable, despite the fact that the letters were reasonably calculated to reach their intended recipients when delivered to the postman." *Id.* No letter with an international destination, sent via a service that does not deliver internationally, can be said to be reasonably calculated to reach its intended recipient. The same is true of those directed to addresses that do not exist. And the same is true of published notice in a newspaper that has no chance of being seen by the individual to be noticed.

83. This lax approach to notice reflects a "process which is a mere gesture"—which is therefore "not due process," *Taylor*, 136 S. Ct. at 930.

**D. <u>New Jersey Seized Plaintiff's Property Without Notice, Used It For Public Purposes, and Provided Inadequate Compensation</u>**

84. As explained above, Plaintiff is the legal representative of the estate of Hernan Correa Borquez and, through him, of the estate of Rene Correa Borquez.

85. Mr. Rene Correa Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States. His name and address in Chile were associated with all of his accounts. If notice had been sent to his address, he

and/or his heirs would have received it. Indeed, notices from the companies he invested in (for example concerning dividends) were received by the Borquez Family until New Jersey seized the shares. Therefore, it would have been eminently practicable for New Jersey to give him and his heirs individualized notice as to the stocks Mr. Borquez owned.

86. He died testate in Chile on May 27, 2006. Mr. Borquez left the entirety of his estate to his brother, Hernan Correa Borquez, who also resided in Chile.

87. Hernan Correa Borquez died in Chile on December 22, 2007. His heirs (the "Borquez Family") all reside in the country of Chile.

88. Indeed, there is **no** nexus between the members of the Borquez Family and the State of New Jersey. No member of the family has ever resided in New Jersey.

89. Yet, New Jersey later escheated Mr. Borquez's investments without providing any notice to the Borquez Family.

90. No written or published notice was ever received—before or after the escheatment.

91. New Jersey did not conduct any investigations or inquiries regarding the Borquez's accounts to determine the name or address of the owners or otherwise alert them that their property was being escheated and then liquidated.

92. Mr. Rene Correa Borquez owned 905 shares of stock in Exxon Corp. (now Exxon Mobil Corp.) that were seized by the Administrator.

93. Mr. Vial, as representative of all the heirs of Rene Correa Borquez, submitted a claim and supporting documentation to New Jersey. Following extensive efforts to recover his assets, including paying $112,144 to a firm to recover those assets, the State of New Jersey provided him a letter concluding its administrative process with a determination of the amounts owed on November 6, 2023.

94. On November 8, 2023, Plaintiff received the sum of $487,581.23 from the State for those shares.

95. Additional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine.

96. Neither Plaintiff, any heir, nor any other representative of Mr. Rene Borquez's or his brother's estates received *any* notice that the Administrator had seized the above property. No written or published notice was ever received. Had the Administrator provided Mr. Borquez or his heirs notice that he would seize the property, they would have acted to prevent that seizure.

97. But for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned.

98. Accordingly, the final sum received by Plaintiff is grossly inadequate because it fails to put Plaintiff in the same position monetarily as he would have occupied if his property had not been seized and taken by the State without constitutionally required notice.

99. Plaintiff is entitled to no less than the current market value of the seized property, as of the filing of his original Complaint.

100. But the Administrator refuses to make Plaintiff whole for this unconstitutional seizure of hundreds of thousands in private property.

**E. Plaintiff Has Property That Is Likely To Be Escheated To New Jersey Without Notice Under the NJUPA**

101. Plaintiff continues to suffer ongoing injury from the NJUPA in three ways: (1) he has additional property that is likely to be escheated without notice; (2) he must make efforts to prevent that, which is its own injury; and (3) he is deterred from acquiring additional property because of the unclaimed property regime.

102. Plaintiff is the owner of and legal representative for additional property vulnerable to seizure and taking under the NJUPA. For example, in an attempt to begin repurchasing some of the property New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobile via Tradeup Securities (which is a New Jersey corporation).

103. The NJUPA provides that property may be subject to escheat if "[t]he holder is a domiciliary" of New Jersey and the "last known address . . . of the apparent owner is in a state that does not provide by law for the escheat or custodial taking of the property," N.J. Stat. Ann. § 46:30B-10(d). The NJUPA defines "holder" as "a person, wherever organized or domiciled, who is the original obligor indebted to another on an obligation . . ." N.J. Stat. Ann. § 46:30B-6(g).

104. Plaintiff holds his Exxon shares at a brokerage called TradeUp Securities, which is a New Jersey corporation. Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile—not a state with an escheat law within the meaning of Section 46:30B-10(d). And Plaintiff intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come. Thus, because Plaintiff's last known address is not in a "state" that would escheat his property, the NJUPA would require TradeUp to escheat the property to New Jersey, as a New Jersey domiciliary. *See State v. Garford Trucking*, 4 N.J. 346, 351, 72 A.2d 851, 854 (1950) ("A corporation created and existing under the laws of New Jersey may have a 'commercial domicile' or 'business situs' elsewhere for taxation and other purposes; but it is nonetheless domiciled and resident in the state of its creation . . .").

105. As is relevant to Plaintiff, stocks are deemed "abandoned" if the owner goes three years without interacting with the holder or the account in such a way that the NJUPA specifies. *See* N.J. Stat. Ann. §§ 46:30B-7–7.1.

106. As a result, if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account (such as a deposit of withdrawal), N.J. Stat. Ann. § 46:30B-7.1, or if dividends are automatically reinvested, three years after the second statement or other account notification is returned as undeliverable or after the holder discontinued mailings, N.J. Stat. Ann. § 46:30B-31, the NJUPA requires his broker to remit all of the owner's stocks to the state, N.J. Stat. Ann. § 46:30B-57.

107. Accordingly, it is certain that Plaintiff's shares would escheat to New Jersey if he subscribed to a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years, and does not have automatic reinvestment of dividends. That is currently Plaintiff's plan for these shares.

108. To avoid escheat, Plaintiff would be required to churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it.

109. Plaintiff reasonably believes he will not receive pre-deprivation notice from the State for the reasons described in Section B, above.

110. Plaintiff will not receive notice (even post-escheatment) for the reasons described in Section C, above.

111. Because Plaintiff cannot rely on notice, he is required to monitor that property continuously in order to ensure that the State does not attempt to seize it. He is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States. The Ninth Circuit recognized the

burden of "having to continually monitor [one's] property" as the sort of injury establishing standing to seek prospective relief and meriting an injunction. *Taylor II*, 488 F.3d at 1200.

112. Finally, the NJUPA deters Plaintiff from acquiring further property that might be subject to seizure under the NJUPA. Absent the NJUPA, Plaintiff would take concrete steps toward the acquisition of additional property in the United States that would be subject to the NJUPA. This represents an additional injury suffered by Plaintiff.

**F. <u>The Relief Sought Would Not Implicate the Eleventh Amendment</u>**

113. Sovereign immunity would not bar the relief Plaintiff (and the class) seek. As explained in greater detail below, Plaintiff seeks prospective declaratory and injunctive relief, including alterations to the way that NJUPA is administered to ensure notice is provided in a manner that complies with constitutional requirements (falling squarely within the *Ex parte Young* exception).

114. And Plaintiff, on behalf of himself and the putative Class (defined below), seeks an accounting and the return of their own escheated property in the possession of the State. New Jersey holds the escheated property in a custodial trust until claimed by the owner or the owner's successor in interest. N.J. Stat. Ann. § 46:30B-61. Accordingly, the Eleventh Amendment likewise does not bar such relief. *See Suever v. Connell*, 439 F.3d 1142, 1147 (9th Cir. 2006) ("Claims requesting the return of individuals' property are less likely to offend a state's sovereign immunity than claims requesting the payment of government funds.").

115. Even for the seized property that New Jersey has liquidated, sovereign immunity does not apply.

116. The Administrator manages an unclaimed property trust fund, which under the NJUPA is "administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J. Stat. Ann. §

46:30B-74(c). Twenty-five percent of the escheated funds *must* remain in that trust fund, according to statute, and does not become part of the "General State Fund." *Id.*

117. Indeed, because the revenue for unclaimed property in New Jersey is managed in a trust fund, relief in this case would not implicate the State's general fund. Indeed, the money paid to Plaintiff was from a separate account called "UNCLAIMED PERSONAL PROPERTY TR FD."

118. "The purpose of all escheat laws is not only to enrich the State but to put into active use funds that are unclaimed and lying dormant. Yet, escheat statutes should be distinguished from custodial statutes which make the State a custodian of the abandoned property, subject to delivery to those who prove ownership or a right to possession." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022) (quoting *Commonwealth of Penna. v. Kervick*, 114 N.J. Super. 1, 8 (Ch. Div. 1971), *rev'd on other grounds* 60 N.J. 289 (1972). The NJUPA is decidedly of the latter category. First, "the mechanics of the [NJ]UPA, specifically the placement of collected abandoned funds in a separate trust account, confirms the custodial nature of New Jersey's unclaimed property laws." *Salvato*, 2022 WL 1224962, at *6. Second, Defendants admitted in *Salvato* that "when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner[.]'" *Id.*

119. The custodial purpose of the NJUPA is also the self-selected "Mission Statement" of the New Jersey Unclaimed Property Administration: "The New Jersey Unclaimed Property Statute ensures that property owners never relinquish the right to this property and the UPA only acts as a custodian until the property is returned."[13]

[13] New Jersey Unclaimed Property Administration, *About Section*, WWW.NJ.GOV, https://www.nj.gov/treasury/unclaimed-property/aboutunclaim.shtml#:~:text=The%20Newu%20Jersey%20Unclaimed%20Property,acts%200b20as%20a%20custodian%20until (last accessed April 15, 2025) [Permalink: https://perma.cc/66D8-Q7CN].

120. These facts, combined with the fact that NJUPA permits these reimbursements to be made at any time, demonstrate the custodial trust nature of the proceeds from the liquidations of unclaimed property. *See Suever*, 439 F.3d at 1147 ("the Eleventh Amendment did not apply to funds that had been escheated, but not permanently escheated, because the State held such funds in custodial trust for the benefit of property owners—the funds were not State funds"); *see also Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) (explaining that unclaimed property laws "require that once property has been deemed abandoned, the holder turn it over to the state while the original property owner still maintains the right to the property").

121. Plaintiff and Class Members seek to be made whole from funds explicitly and purposefully set aside in a custodial trust separate from New Jersey's treasury.

### G. **The Statutes Of Limitations Have Not Run, And In Any Case Have Been Tolled**

122. Plaintiff's legal claims did not fully accrue until November 8, 2023, when the Administrator issued its final sum from the Unclaimed Property Administration, thus making a final determination. Prior to that date, Plaintiff did not know the total amount he would receive from the property that was taken—and therefore did not know that he would not be made whole. At the absolute earliest, the statute of limitations would run from November 6, 2023, the date of the letter from the State indicating what amounts would be paid from which shares.

123. Moreover, prior to that point, Plaintiff was actively engaged in an administrative process to retrieve the escheated shares, including by submitting more information and paperwork as requested. As a result, even if the claims accrued earlier, they were tolled by the constant communications between the State and Plaintiff (and his agents) to satisfy the requirements the State posed on Plaintiff to grant the claims.

124. Plaintiff's extensive communications with the Administration (including through counsel, asset tracing firms, and other entities)—before *and after* that incomplete payment—tolled any applicable statute of limitations.

125. Further, Defendants' acts, omissions, misrepresentations, and practices also tolled or equitably estopped any limitations period. Through such acts, omissions, misrepresentations, and practices, Defendants were able to conceal from Plaintiffs and Class the material facts involving their property. Based on Defendants' breach of their statutory and constitutional obligations to notify Plaintiffs (among other things), Defendants are estopped from asserting a statute of limitations and have waived any such defense.

## CLASS ACTION ALLEGATIONS

126. Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

127. Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of a class of all persons and entities owning purportedly "abandoned" property transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States.

128. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

129. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

130. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

131. Although the exact number, identity, and location of persons in the proposed Class are readily discernible based on Defendant's records, upon information and belief, the number of members in the proposed Class will be more than 1,000 persons. Therefore, those persons in the Class are so numerous that joinder of the entire proposed Class is impractical.

132. Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

133. The claims of the Plaintiff are typical of the claims of the other Class members in that the representative Plaintiff, like all Class members, has had property taken by Defendant without constitutionally adequate notice. Plaintiff, like all Class members, has been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the taken property. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

134. Plaintiff is a member of the proposed Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in complex litigation, including class actions involving issues identical or similar to those raised in this action. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

135. There are questions of law and fact common to all members of the proposed Class, including whether the Defendant complied with the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment by seizing and taking Plaintiff's property without constitutionally required prior notice.

136. Plaintiff's claims are typical of those of the members of the proposed Class, who are subject to the same deprivations of their property and rights, and there is a well-defined commonality of interest in this case's questions of law and fact.

137. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendant's unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

138. Defendant has acted in a uniform manner with respect to Plaintiff and Class members. Because Defendant's duties to comply with the Constitution apply equally to each person in the proposed Class, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

139. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of many of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

140. Class treatment in this Court will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication by providing common answers to the common questions of constitutionality that predominate this action.

141. Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendant has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendant's liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Class-wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendant's discharge of their duties to carry out his duties in accordance with the Constitution. Defendant's actions and threatened actions deprived, are depriving, and will deprive Plaintiff and the members of the proposed Class of their constitutional rights on grounds generally applicable to all, thereby making appropriate declaratory and injunctive relief with regard to the proposed Class as a whole.

## FIRST CLAIM FOR RELIEF

**(U.S. Const. Fourteenth Amendment § 1 - Due Process Clause:<br>42 U.S.C. § 1983 – All Defendants)**

142. The allegations set forth above are incorporated into this claim by reference as though set forth in full here.

143. The Fourteenth Amendment, Section 1, of the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." A claim alleging violation(s) of this federal right may be brought under 42 U.S.C. § 1983.

144. Under the color of law provided by the Statute, the Administrator has violated (and continues to violate) the Plaintiff's right to due process through the enforcement and administration of the Statute by depriving him of his property without due process.

145. In every instance that the Statute allows the Administrator to seize property without notice, it allows the Administrator to violate the constitutional rights of Plaintiff and Class members. Therefore, the Statute is facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property.

146. Neither the Plaintiff nor any other heirs of Mr. Borquez received notice of the seizure of Mr. Borquez's property.

147. Plaintiff, as well as the owners of existing property, have a constitutionally protected property interest in the private property that they own and that is seized by the Administrator as described herein. Defendant deprived Plaintiff and other property owners of their constitutionally protected property interests by seizing their property without notice and due process.

148. Plaintiff did not receive fair compensation for the loss of property. The recovery Plaintiff has received from the Office of Unclaimed Property is grossly inadequate. It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

149. Unless the Administrator is enjoined from continuing to enforce and administer the Statute, she will continue to violate the constitutional rights of Plaintiff and Class members.

150. Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights

guaranteed to Plaintiff and the Class members by the Fourteenth Amendment's Due Process Clause.

**SECOND CLAIM FOR RELIEF**

**(U.S. Const., Fifth Amendment - Takings Clause: 42 U.S.C. § 1983 – All Defendants)**

151. The allegations set forth above are incorporated into this claim by reference as though set forth in full.

152. The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall . . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment incorporates the Takings Clause and applies it to New Jersey. *See Chicago Burlington and Quincy R.R. v. City of Chicago*, 166 U.S. 226 (1897). The Takings Clause is enforceable via an action brought under 42 U.S.C. § 1983.

153. Under the color of law provided by the NJUPA, Defendants have violated (and continue to violate) Plaintiff's rights under the Takings Clause through their enforcement and administration of the NJUPA by taking Plaintiff's property without just compensation.

154. On information and belief, New Jersey employed the proceeds from Plaintiff's unclaimed property for public use. *See* N.J. Stat. Ann. § 46:30B-74(c).

155. "When a state directly appropriates private property, it is considered a per se taking, and the state has a duty to compensate the owner." *Am. Exp. Travel Related Servs., Inc.*, 669 F.3d at 370 (3d Cir. 2012).

156. Plaintiff did not receive just compensation for the loss of his property.

157. The recovery Plaintiff has received from the Office of Unclaimed Property is grossly inadequate by at least **$136,354.77**.[14] As explained in Section D, above, the amount New Jersey finally returned fails to put Plaintiff in the same position as he would have occupied if the property had not been seized and taken by the State for public use. Yet, the Fifth Amendment commands that when property is appropriated by the States, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

158. It was only because the State Escheator liquidated Plaintiff's equities (without taking ***any*** steps to provide him notice) that the State is unable to comply with his request for the return of his shares.

159. And it is only because of the grossly inadequate recovery which fails to account for appreciation, dividends, or interest, that Plaintiff cannot be made whole by simply repurchasing all of the seized shares. Indeed, in order to repurchase all of the seized shares, Plaintiff would need an additional $136,354.77 beyond what New Jersey remitted to him.

160. Further, Defendants fail to pay interest on the private property that is seized and taken, and the nonpayment of interest is itself a separate violation of the Takings Clause.

161. Defendants are acting in the capacity of a private trustee and custodian of private funds.

162. Unless Defendants are enjoined from continuing to enforce and administer the Statute, they will continue to violate the constitutional rights of Plaintiff and other Class Members for the foreseeable future.

---

[14] This represents the difference between the value of the escheated Exxon stock at the time of the filing of the original complaint ($623,936) and the amount paid by the State in response to Plaintiff's claim, $487,581.23.

163. Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiff and the Class members by the Fifth Amendment's Takings Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class Members, respectfully request that the Court grant certification of the proposed Class, including the designation of Plaintiff as the named representative of the Class, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in their favor and against Defendants as follows:

A. An order enjoining Defendants from seizing property under the NJUPA currently owned by Plaintiff without first providing the "pre-escheat notice the Constitution requires" through a process "'reasonably calculated' to reach the interested party—here, the property owner." *Taylor,* 136 S. Ct. at 930.

B. An order enjoining Defendants from continuing to administer the NJUPA in violation of the Fifth and Fourteenth Amendments of the United States Constitution by seizing property from property owners without first providing them the "pre-escheat notice the Constitution requires" through a process "'reasonably calculated' to reach the interested party—here, the property owner." *Taylor*, 136 S. Ct. at 930.

C. An equitable accounting to identify the properties seized from Plaintiff and the Class Members without constitutionally adequate notice because those amounts are unknown and cannot be ascertained without information within the exclusive knowledge of the State;

D. <u>Injunctive and equitable relief requiring Defendants to return (rather than destroy</u> or liquidate) the property belonging to each Plaintiff and Class Member that is still in the State's

possession, or otherwise put Plaintiff and Class Members in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken, including compensation for any appreciation in the value of the property since its seizure;

E. A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

F. A declaration that Defendants' administration of the NJUPA against Plaintiff and the Class Members in the ways outlined in this Complaint violates the Fifth and Fourteenth Amendments of the United States Constitution;

G. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H. An award of costs and attorneys' fees, as allowed by 42 U.S.C. § 1988;

I. Leave to amend this Complaint to conform to the evidence produced at trial; and

J. Such other or further relief as the Court may deem appropriate, just, and equitable.

Respectfully Submitted,

DATED: May 5, 2025

By:/s/ Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ. (NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile: (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com

*Attorneys for Plaintiff*