

**WILENTZ**

—ATTORNEYS AT LAW—

WILENTZ GOLDMAN & SPITZER P.A.

**KEVIN P. RODDY, ESQ.**

T: 732.855.6402
F: 732.726.6686
kroddy@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

July 7, 2025

**Via Electronic Mail**

Valerie Hamilton, Esq.
Deputy Attorney General
State of New Jersey – Office of the Attorney General
25 Market Street
Trenton, NJ 08625-0106

      Re:        *Vial v. Muoio,* Case No. 3:24-cv-11301-RK-JBD (D/N.J.)

Dear Valerie:

      In accordance with the procedures specified by Judge Kirsch in his Text Order dated May 6, 2025 (ECF No. 46), enclosed for service upon you is a copy of Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss Amended Complaint. In accordance with those procedures, the enclosed brief has not been filed with the Court but is hereby served upon your office for response.

                        WILENTZ, GOLDMAN & SPITZER, P.A.
                        By:  *Kevin P. Roddy*
                              KEVIN P. RODDY
                              Counsel for Plaintiffs

Enclosure
cc:    Kseniya Lezhnev, Esq.
      William Palmer, Esq.
      Jonathan Massey, Esq.
      Bret Vallacher, Esq.
      Matthew Layden, Esq.
      (all via e-mail with enclosure)

#95382190.1

**Wilentz, Goldman & Spitzer, P.A.**    Woodbridge | New York | Philadelphia | Red Bank | Perth Amboy    www.wilentz.com

Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW,
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiff Vial and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION. <br><br> Defendants. | **PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT** <br><br><br> **Case No.: 3:24-cv-11301** |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

COUNTER-STATEMENT OF FACTS ................................................................ 7

ARGUMENT ................................................................................................... 10

I.    THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS.............. 11

    A.    Plaintiff, On Behalf Of The Proposed Class Seeks Return Of Their Property........................................................................................ 11

    B.    The Unclaimed Property Fund Contains Private Property Held In Trust By the State, Not Public Money................................................. 12

    C.    The Requested Relief Is Permissible Under *Ex parte Young* ............. 19

II.    PLAINTIFF HAS STANDING TO SUE ................................................... 21

    A.    Plaintiff Has Alleged an Actual and Imminent Injury........................ 21

    B.    Plaintiff's Injury Is Fairly Traceable to Defendants' Actions ............ 29

III.    PLAINTIFF'S NOTICE CLAIMS ARE TIMELY ....................................... 31

IV.    PLAINTIFF BRINGS A FACIAL CHALLENGE TO THE NJUPA WITH RESPECT TO FOREIGN PROPERTY OWNERS............................................. 33

V.    PLAINTIFF HAS PROPERLY STATED A TAKINGS CLAIM ................................. 33

VI.    BURFORD ABSTENTION IS INAPPLICABLE TO THIS CASE............................... 37

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush,*
   329 F.3d 1255 (11th Cir. 2003).................................................................23

*Accord Pic-A-State Pa., Inc. v. Reno,*
   76 F.3d 1294 (3d Cir. 1996)...................................................................29

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff,*
   669 F.3d 359 (3d Cir. 2012)..............................................................15, 33

*Bruni v. City of Pittsburgh,*
   824 F.3d 353 (3d Cir. 2016).................................................................3, 32

*Calderon v. U.S. Dep't of Agric., Food & Nutrition Serv.,*
   756 F. Supp. 181 (D.N.J. 1990) ...........................................................32

*Chiropractic Am. v. LaVecchia,*
   180 F.3d 99 (3d Cir. 1999)....................................................................40

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................................26

*Cordoba v. DIRECTV, LLC,*
   942 F.3d 1259 (11th Cir. 2019)............................................................30

*Empire Abrasive Equip. Co., LP v. Acceptance Ins. Co.,*
   302 F. Supp. 3d 687 (E.D. Pa. 2018) ...................................................38

*Ethypharm S.A. France v. Abbott Labs.,*
   707 F.3d 223 (3d Cir. 2013)..................................................................11

*Ex parte Young,*
   209 U.S. 123 (1908) ..............................................................4, 19, 20, 21

*Fuentes v. Shevin,*
   407 U.S. 67 (1972) ...............................................................................25

*Garza v. Woods,*
   No. 22-01310-PHX-JJT, 2023 WL 5608414 (D. Ariz. Aug. 30, 2023)...........16

ii

*Gerlach v. Rokita*,
    95 F.4th 493 (7th Cir. 2024)...................................................................................16

*Hess v. Port Auth. Trans-Hudson Corp.*,
    513 U.S. 30 (1994)...............................................................................................18

*Jones v. Flowers*,
    547 U.S. 220 (2006)...........................................................................................2, 27

*Knellinger v. Young*,
    134 F.4th 1034 (10th Cir. 2025)........................................................................5, 22

*Knick v. Township of Scott, Pa.*,
    588 U.S.180 (2019)..............................................................................................34

*Knick v. Twp. of Scott, Pennsylvania*,
    588 U.S. 180 (2019).............................................................................................16

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
    876 F.3d 481 (3d Cir. 2017)...................................................................................1

*Maron v. Chief Fin. Officer of Fla.*,
    136 F.4th 1322 (11th Cir. 2025)........................................................................5, 21

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007).............................................................................................22

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).........................................................................................28, 29

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................................................2, 9

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989).........................................................................................37, 39

*Olson v. United States*,
    292 U.S. 246 (1934).............................................................................................34

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988).................................................................................................23

iii

*Peters v. Cohen,*
No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025)............................26, 35

*Ross v. Meese,*
818 F.2d 1132 (4th Cir. 1987).........................................................................25

*Salvato v. Harris,*
No. CV 21-12706 (FLW), 2022 WL 1224962
(D.N.J. Apr. 26, 2022)............................................................................passim

*Schmidt v. Skolas,*
770 F.3d 241 (3d Cir. 2014)............................................................................32

*State v. Garford Trucking, Inc.,*
72 A.2d 851 (1950) .........................................................................................24

*Suever v. Connell,*
439 F.3d 1142 (9th Cir. 2006)..........................................................11, 14, 35

*Taylor v. Chiang,*
CIV. S-01-2407 WBS GGH, 2007 WL 1628050
(E.D. Cal. June 1, 2007)..........................................................................26, 35

*Taylor v. Westly,*
402 F.3d 924, 932 (9th Cir. 2005)......................................................14, 15, 35

*Taylor v. Westly,*
488 F.3d 1197 (9th Cir. 2007).....................................................................6, 28

*Taylor v. Yee,*
136 S. Ct. 929 (2016) .......................................................................................1

*Texaco, Inc. v. Short,*
454 U.S. 516 (1982) .......................................................................................36

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .....................................................................................5, 22

*Tyler v. Hennepin Cnty., Minnesota,*
598 U.S. 631 (2023) ..................................................................................22, 36

*United Servs. Auto. Ass'n v. Muir,*
792 F.2d 356 (3d Cir. 1986)............................................................................39

iv

*United States v. 564.54 Acres Land,*
    441 U.S. 506 (1979) ....................................................................34, 35

*United States v. James Daniel Good Real Prop.,*
    510 U.S. 43 (1993) .............................................................................2

*United States v. Reynolds,*
    397 U.S. 14 (1970) .......................................................3, 12, 34, 35

*Univ. of Md. at Balt. v. Peat Marwick Main & Co.,*
    923 F.2d 265 (3d Cir. 1991)............................................................39

*Va. Office for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) .......................................................................20

*Village of Elk Grove Village v. Evans,*
    997 F.2d 328 (7th Cir. 1993)..........................................................23

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,*
    712 F.3d 165 (3d Cir. 2013)..............................................................6

*Waterfront Comm'n of New York Harbor v. Governor of N.J.,*
    961 F.3d 234 (3d Cir. 2020)............................................................20

*Zimmerman v. City of Austin, Tex.,*
    881 F.3d 378 (5th Cir. 2018)..........................................................30

**Statutes**

42 U.S.C. § 1983 ...................................................................................37

N.J.S.A. § 46:30B-1 ...............................................................................1

N.J.S.A. § 46:30B-6 ..............................................................................24

N.J.S.A. § 46:30B-7 ................................................................................8

N.J.S.A. § 46:30B-7.1 ......................................................................24, 26

N.J.S.A. § 46:30B-10 ............................................................................24

N.J.S.A. § 46:30B-31 ....................................................................8, 24, 26

N.J.S.A. § 46:30B-46 ..............................................................................7

N.J.S.A. § 46:30B-50 ............................................................................................ 8

N.J.S.A. § 46:30B-50.1 ......................................................................................... 9

N.J.S.A. § 46:30B-51 ........................................................................................ 8, 9

N.J.S.A. § 46:30B-52 ............................................................................................ 9

N.J.S.A. § 46:30B-57 ........................................................................................ 7, 8

N.J.S.A. § 46:30B-60.1 ......................................................................................... 8

N.J.S.A. § 46:30B-61 ........................................................................................ 4, 8

N.J.S.A. § 46:30B-74 ................................................................................... passim

N.J.S.A. § 46:30B-77 ...................................................................................... 13, 15

**Other Authorities**

United States Postal Service, Certified Mail® - The Basics, WWW.USPS.COM,
    https://faq.usps.com/s/article/Certified-Mail-The-Basics
    (last accessed April 24, 2025) ........................................................................ 9

Warren E. Buffett, *Chairman's Letter* (1996), available at
    https://www.berkshirehathaway.com/letters/1996.html ................................. 36

## INTRODUCTION AND SUMMARY OF ARGUMENT

This proposed class action challenges the constitutionality of New Jersey's escheatment scheme set forth in the New Jersey Uniform Unclaimed Property Act, N.J.S.A. § 46:30B-1 et seq. (hereinafter the "NJUPA" or the "Statute"), both as applied to Plaintiff and on its face with respect to other foreign property owners, who are systematically denied constitutionally adequate notice under the Statute prior to the seizure of their property.

The Third Circuit has warned that, "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) (internal quotation marks and citation omitted). Justices of the U.S. Supreme Court have expressed constitutional concern about state unclaimed property laws. *See Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in the denial of certiorari) ("This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns [regarding States'] constitutional obligation to provide adequate notice before escheating private property.").

Plaintiff is a citizen and resident of Chile who received **no notice at all** before his (and his family's) Exxon Mobil shares were seized and taken by Defendants

1

under the NJUPA. *See* Amended Complaint, ECF No. 45, (hereinafter "AC") ¶ 13. Plaintiff seeks to vindicate his and his proposed Class members' constitutional right to notice "reasonably calculated, under all the circumstances, to apprise" them of New Jersey's seizure of their property before the deprivation occurs. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process.").

As explained in the Amended Complaint, Plaintiff and proposed Class members are categorically denied ___any___ pre-escheat notice whatsoever because the NJUPA delegates New Jersey's prior notice obligation to holders and commands them to provide notice only by certified mail, which is entirely unavailable for overseas owners. AC ¶¶ 58–63. But the Supreme Court has instructed that following a process the government knows will not result in actual notice, does not "relieve[] the State of its constitutional obligation to provide adequate notice." *Jones v. Flowers*, 547 U.S. 220, 232 (2006); *see id.* at 229 ("If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again."); *id.* at 232 (rejecting the "Commissioner's position that he must do nothing more when the notice is promptly returned 'unclaimed'").

2

Defendants' motion to dismiss whistles past the graveyard, entirely ignoring this glaring flaw in New Jersey's escheatment regime which categorically denies pre-escheat notice to the entire Class.

Plaintiff also seeks to vindicate his and his proposed Class members' constitutional rights under the Fifth Amendment Takings Clause to be put in the "same position monetarily as [they] would have occupied if [their] property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). But for New Jersey's unnoticed seizure and liquidation of the Borquez Family's Exxon Mobil stocks, Plaintiff would own property valued at over $623,936 instead of the $487,581.23 returned by Defendants. AC ¶ 97.

Defendants' arguments to protect this lucrative but unconstitutional scheme are unavailing—and impermissibly rely on assertions neither found in the Amended Complaint nor otherwise judicially noticeable. *See, e.g.,* Motion to Dismiss, (hereinafter "MTD") at 15. Contrary to Defendants' assertions, the Third Circuit has repeatedly made clear that this Court ***cannot*** consider declarations or testimony on a motion to dismiss. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016) (reversing grant of motion to dismiss because the "District Court here based its decision to dismiss not only upon the allegations in the Complaint but also, it appears, upon testimony given at the hearing and the supplemental declarations filed

3

by" plaintiffs). Plaintiff's claims survive the pleading stage for the reasons explained throughout this memorandum and outlined briefly below:

The Eleventh Amendment does not bar Plaintiff's claims, which are remedied through prospective declaratory and injunctive relief, including alterations to the way that the NJUPA is administered to ensure notice is provided in a manner that complies with constitutional requirements (falling squarely within the *Ex parte Young* exception). *See* AC ¶¶ 113–21. In addition, Plaintiff seeks an accounting and the return of his own escheated property in the possession of the State. AC ¶ 114. New Jersey holds the escheated property in a custodial trust until claimed by the owner or the owner's successor in interest. N.J.S.A. § 46:30B-61. Currently, Defendants hold over $6 billion in purportedly "unclaimed" property. AC ¶ 6. Thus, Plaintiff can be made whole without paying out a penny of public money. AC ¶¶ 116–17. A court in this District has already flatly rejected Defendants' argument, holding that "the Eleventh Amendment does not bar Plaintiff's claims for return of her own property under the UPA, because such claims are not for 'damages' against the State." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022). Judge Wolfson opined that "the mechanics of the [NJ]UPA, specifically the placement of collected abandoned funds in a separate trust account, confirms the custodial nature of New Jersey's unclaimed property laws." *Id.* Defendants admitted in *Salvato* that "when property is transferred to the State under

4

the auspices of the UPA, the 'funds [are held] <u>in perpetuity for the true owner</u>[.]'" *Id.* (citing Defendant's Salvato Brief at 38) (emphasis original). The Eleventh Circuit also recently rejected the State of Florida's sovereign immunity objection in a similar case. *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333 (11th Cir. 2025). In short, the Eleventh Amendment is no bar to the relief sought.

Plaintiff has Article III standing because he has suffered a classic pocketbook injury in the form of a loss of more than $100,000. AC ¶ 97. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or **monetary injury** to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." (emphasis added)). Both the Tenth and Eleventh Circuits have recently rejected similar standing arguments in unclaimed property cases. *Maron*, 136 F.4th at 1329–31; *Knellinger v. Young*, 134 F.4th 1034, 1042 (10th Cir. 2025). Defendants' arguments to the contrary are not only wrong but would require this Court to impermissibly consider Defendants' factual assertions that are neither in the Amended Complaint nor judicially noticeable.

Plaintiff also has standing to sue for prospective relief because, unless he acts to prevent it, additional property he holds will be seized again without notice due to the constitutionally inadequate notice provisions in the NJUPA. AC ¶¶ 119–128. Defendants suggest that Plaintiff could avoid this injury by undertaking additional activities, such as monitoring or churning his account, *see* MTD at 26–27, but as the

Ninth Circuit recognized, "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include . . . the cost of having to constantly monitor their property to avoid escheat," including by "*'churning' their property so that it stays active and avoids escheat*," *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007) (emphasis added).

Plaintiff's claims are timely because he filed suit within two years of the November 2023 final determination of his administrative claim—which started running the statute of limitations. AC ¶ 122. Despite the Amended Complaint's explicit reliance on this date, Defendants *entirely ignore this fact.* Instead, Defendants rely on irrelevant contentions—not found in the Amended Complaint— pertaining to when Plaintiff first began taking steps on his Kafkaesque journey to retrieve property seized from thousands of miles away by a state to which he had no nexus. Even if those allegations were relevant (and they are not), this Court may not consider them. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013) (An "amended pleading supersedes the original pleading" such that "facts not incorporated into the amended pleading . . . cannot be considered by the court on a motion to dismiss the amended complaint." (cleaned up)).

Plaintiff has suffered a taking because his property was seized by the State without the payment of just compensation. *See generally* AC ¶¶ 84–100.

6

Defendants' arguments to the contrary again impermissibly rely on facts not found in the Amended Complaint. At bottom, if New Jersey "wishes to avoid defending against § 1983 suits for unclaimed property, it may always decide voluntarily to revise its laws or practices with respect to unclaimed property" to ensure just compensation. *Knellinger v. Young*, 134 F.4th 1034, 1045 (10th Cir. 2025).

And, finally, *Burford* abstention is inapplicable to straightforward federal claims that test the constitutionality of a state law like the NJUPA. Ironically, Defendants' *Burford* abstention argument also rests on the "available state-based avenues," MTD at 3, that Plaintiff pursued until he secured a final decision in November 2023. Thus, Defendants contend that the state law administrative process is so critical that wholesale abstention is warranted to protect it. At the same time, according to Defendants, for the purpose of determining timeliness, the claimant should have *immediately* filed suit in federal court to be timely, rather than exhausting the administrative avenue for relief first. This Court should not allow Defendants to have it both ways.

## COUNTER-STATEMENT OF FACTS

Plaintiff rests on the allegations in the Amended Complaint, but includes here a shortened statement of facts, both for this Court's convenience and to highlight the facts most relevant to issues raised in the Motion to Dismiss:

The NJUPA requires every business doing business in New Jersey—including

7

banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J.S.A. §§ 46:30B-46; 46:30B-57. New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore, "abandoned." N.J.S.A. § 46:30B-7. The same period applies to securities. *See* N.J.S.A. § 46:30B-31.

If an account is not active in the ways specified in the NJUPA for three years—for example, if a customer is using a buy-and-hold approach to investment (i.e., does nothing, makes no deposits or withdrawals or asset reallocations) for three years—the account would be deemed "abandoned" and the holder must report it and escheat it to the State. *Id.* The holder is immunized for escheating the property. *See* N.J.S.A. §§ 46:30B-60.1–61.

Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J.S.A. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J.S.A. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration).

Although the NJUPA imposes this requirement on the holder, the State neither enforces it nor assists with it, and frequently the result is no pre-deprivation notice whatsoever. *See generally* N.J.S.A. §§ 46:30B-50–51.

The NJUPA provides for pre-escheat notice to be given in only one form: the holder must send a letter by certified mail to the owner. N.J.S.A. § 46:30B-50. However, the United States Postal Service only offers the product Certified Mail within the United States (apart from service to U.S. military and diplomatic installations). *See* AC ¶ 16 & n.5 (citing United States Postal Service, Certified Mail® - The Basics, WWW.USPS.COM, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image]). Thus, the Act does not require pre-escheat notice that can even possibly reach individuals like Plaintiff and the proposed Class members, who have addresses located outside of the United States. By simply block-quoting the NJUPA provision on individual notice, Defendants essentially concede this point. *See* MTD at 7.

In those scenarios, the State simply takes the property in question without any pre-escheat notice, N.J.S.A. §§ 46:30B-50.1–52, in direct contravention of the *Mullane* Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property, 339 U.S. at 314. Moreover, published notice—which only occurs after the escheatment—is *never* provided outside the State of New Jersey, regardless of where the owner of the property is believed to have resided. *See* N.J.S.A. § 46:30B-51. The

9

newspaper inserts list only the names and addresses of property owners; there are no descriptions of property or values. *See* N.J.S.A. § 46:30B-52.

The NJUPA provides owners no compensation for the appreciation in the property's value that would have inured to the owner but for the State's involvement. *See* AC ¶ 49. "When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, the right to vote his or her shares in important matters of corporate governance, or the ability to sell the securities." *Id.* Despite depriving owners of these rights associated with stock ownership, the NJUPA provides no compensation for the deprivation of these rights. *Id.*

Defendants imply that unclaimed property funds are held in the state treasury. *See* MTD at 8. This is incorrect. In fact, once liquidated into cash, the proceeds of the escheated property are deposited into a custodial trust fund. *See* N.J.S.A. § 46:30B-74(c) (explaining the Administrator manages the unclaimed property trust fund, which is "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey"). Although seventy-five percent (75%) of the fund may be transferred to the General State Fund, the **remaining 25% must remain in the unclaimed property fund**. *See* N.J.S.A. § 46:30B-74(a)–(c).

## ARGUMENT

## I.  THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS

Defendants primarily argue that this suit is barred by the Eleventh Amendment by myopically focusing on only one of the ten remedies sought: the request for the proposed Class to be put "in the same position monetarily as they would have occupied" if the property had not been taken. *See* MTD at 14 (citing only AC Prayer for Relief ¶ D). However, the Prayer for Relief has *ten paragraphs* labeled A through J. *See* AC ¶¶ A–J. Defendants' motion fails to address, and therefore waives, arguments concerning the vast majority of them.[1] Defendants not only ignore the other relief sought, but their arguments are factually and legally incorrect for multiple reasons.

### A.  Plaintiff, On Behalf Of The Proposed Class Seeks Return Of Their Property

Defendants acknowledge that under *Suever v. Connell*, 439 F.3d 1142, 1147 (9th Cir. 2006), a lawsuit seeking return of one's own property is **not** barred by the Eleventh Amendment, but instead Defendants argue that this caselaw is inapposite because there is "no property that UPA is holding for any Plaintiff, including Borquez and Vial." MTD at 15. That is incorrect.

At the outset, it's worth pointing out that this is a Class action complaint on behalf of "all persons and entities owning purportedly 'abandoned' property

---

[1] *See Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n. 13 (3d Cir. 2013) ("[A]n issue is waived unless a party raises it in its opening brief").

11

transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States." AC ¶ 127. Moreover, the Amended Complaint explains that "Mr. Rene Correa Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States," AC ¶ 85, and although Plaintiff is aware that Exxon stock was seized, AC ¶ 92, "[a]dditional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine," AC ¶ 95. This is precisely why Plaintiff seeks an "equitable accounting to identify the properties seized from Plaintiff and the Class Members without constitutionally adequate notice because those amounts are unknown and cannot be ascertained without information within the exclusive knowledge of the State." AC, Prayer for Relief ¶ C.

**B.    The Unclaimed Property Fund Contains Private Property Held In Trust By the State, Not Public Money**

Defendants next argue that Plaintiff may not seek to put "in the same position monetarily as they would have occupied" if the property had not been taken, MTD at 14, despite the Supreme Court's holding that the Fifth Amendment commands that "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken," *United States v. Reynolds*, 397 U.S. 14, 16 (1970). Defendants present three arguments, but none has merit.

12

Defendants' first argument is that the Eleventh Amendment applies because the Fund "remains subject to annual appropriation by the Legislature." MTD at 16. However, Judge Wolfson has previously considered this fact and did not deem it dispositive: "[A]lthough the Legislature still must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims, all unclaimed funds are held by the Treasurer as trustee for the public interest." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022) (internal quotation marks and citation omitted).

In *Salvato*, the Court held that the Eleventh Amendment was not implicated by the suit for return of property after seizure under the NJUPA because the NJUPA is a custodial statute (as opposed to a true escheatment scheme) that held funds in trust and did not implicate the state treasury. 2022 WL 1224962, at *5 ("the [NJ]UPA provides for custodial escheat as opposed to absolute escheat"). Critically, the Court observed that the NJUPA allows for claims to be made for the return of property at any time. *Id.* at *5 (citing N.J.S.A. § 46:30B-77). And Defendants actually conceded this point in *Salvato*, "stating that when property is transferred to the State under the auspices of the UPA, the 'funds [are held] <u>in perpetuity for the true owner</u>[.]" *Id.* (citing Defendant's *Salvato* Brief at 38) (emphasis original). Indeed, as Defendants now concede, "the Act provides that title to unclaimed

13

property does not vest in the State, but rather remains vested in the owner, with the State acting as custodian while holding his property." MTD at 5.

After analyzing the structure of the NJUPA, this Court found that the Act's creation of a "separate trust account" for abandoned funds "confirms the custodial nature of New Jersey's unclaimed property laws." *Salvato,* 2022 WL 1224962 at *6. "Unless the Administrator deems it 'prudent and advisable,' 75% of all funds received are transferred to the State's General Fund." *Id.* (quoting N.J.S.A. § 46:30B-74). "The remaining portion, however, is 'retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey.'" *Id.* (quoting N.J.S.A. § 46:30B-74(c) ). As a result, twenty-five percent of the escheated funds must remain in that trust fund and may not be transferred to the "General State Fund." *Id.*

Other courts have similarly held that the Eleventh Amendment does not bar constitutional claims for the return of improperly seized property that is held in trust and has not been permanently escheated. *See, e.g., Taylor v. Westly,* 402 F.3d 924, 932 (9th Cir. 2005) ("Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars."); *see also Suever,* 439 F.3d at 1147 ("the Eleventh Amendment did not apply to funds that had been escheated, but not permanently escheated, because the State held such

14

funds in custodial trust for the benefit of property owners—the funds were not State funds"); *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) (explaining that unclaimed property laws "require that once property has been deemed abandoned, the holder turn it over to the state while the original property owner still maintains the right to the property").

In *Taylor*, the Ninth Circuit used similar reasoning to reach an identical result regarding California's unclaimed property statute. 402 F.3d at 930–35. The Ninth Circuit reasoned that "[t]he California statutes distinguish between 'escheat' and 'permanent escheat.' Where the property has not 'permanently' escheated to the state, the state's Unclaimed Property Law sets up a custodial escheat system." *Id.* at 930. The *Taylor* Court concluded that, as a result, "money, even if in the general fund, is not held free and clear by the State of California, but subject to retransfer if the property is later found not to be permanently escheated." *Id.* at 931.

The NJUPA's unclaimed property fund is similarly custodial in nature. Regardless of when property is sold, and regardless of how much is transferred to the State's general fund, the remainder must be "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c) . A person can claim their abandoned property at any time, and there is no provision in the NJUPA that would limit the ability to claim

15

said property or its proceeds—even *after* its technical passage to the general fund (something not sought here). *See* N.J.S.A. § 46:30B-77; *see also* MTD at 7–8. The cases Defendants cite are also unhelpful to their position.[2]

Defendants' second argument is that returning the fair market value of Plaintiff's property to him would be akin to "raid[ing] other funds [the State] holds for other property owners." MTD at 16. But the argument effectively concedes the Eleventh Amendment point   it assumes that the property in the unclaimed property fund is private property belonging to *other private individuals*, not public money. But just as critically, it is a wholly speculative argument that provides no basis for

---

[2] Defendants cite *Gerlach v. Rokita*, 95 F.4th 493 (7th Cir. 2024) (MTD at 19), but that case involved a claim for compensatory relief that plaintiff herself described as "damages," *id.* at 501 n.5, and a claim for prospective relief that was moot. It did not involve the kind of claims presented here, nor did it address the situation where the State's unclaimed property fund is purely custodial, like New Jersey's. It did not consider the reasoning of *Salvato* with respect to the Eleventh Amendment.   Nor did it discuss the Supreme Court's holding in *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019) ("We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under § 1983 at that time . . . [and] because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action").

Defendants also cite *Garza v. Woods*, No. 22-01310-PHX-JJT, 2023 WL 5608414 (D. Ariz. Aug. 30, 2023), but that case makes clear that Arizona's unclaimed property law is different from New Jersey's in crucial aspects. The Arizona statute "mandat[es] deposit of almost all the abandoned monies received in the general fund or trust funds unrelated to unclaimed property for use by the State, as well as not explicitly providing for the retention of individual title to the abandoned property until permanent escheatment occurs." *Id.* at *5. The NJUPA is completely different.

16

dismissal at this stage. The fund contains over $6 billion, AC ¶ 6, and the State has made no showing that all of it will be claimed. Indeed, the State uses the fund to pay bounties to auditors (evidently without any fear that it is transferring private property from the rightful owner to an auditor) and "all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c). If anything, the State's argument is a point for consideration at the remedial phase of this case, not at the outset on a Motion to Dismiss.

Defendants' third argument is related, but even more factually and legally meritless. Defendant contends that if Plaintiff and the proposed Class were made whole, it might exhaust the Fund to the point that the "State would be called upon to expend revenue to make the other owners whole when they filed a claim with the UPA." MTD at 16. There is no basis in the record or anywhere (much less the Amended Complaint) for this assertion. Moreover, it is contradicted by Defendants' own public statements, as outlined in the Amended Complaint: Defendants currently hold over $6 billion in purportedly unclaimed property, AC ¶ 6, and have only returned $2.7 billion since the inception of the program, AC ¶ 30. In other words, for Defendants' concern to come to fruition, the Class members' recovery in this lawsuit alone would have to *__exceed the sum total of all unclaimed property payments New Jersey has ever made twice over__*. Indeed, Defendants' fear is further contradicted by the fact that 75% of the unclaimed property collected flows into the

17

General State Fund, N.J.S.A. § 46:30B-74, which reflects a massive recurring surplus of collections exceeding payments on claims and expenses.

It is true that the surpluses overflowing from the Unclaimed Property Fund would otherwise eventually end up benefiting New Jersey's budget. But binding precedent from the Supreme Court makes clear that this benefit is insufficient to cloak the Unclaimed Property Fund with the protections of the Eleventh Amendment. For example, in *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994), the Supreme Court held that the Port Authority Trans-Hudson Corporation was not cloaked with Eleventh Amendment immunity even though it "dedicates at least some of its surplus to public projects which the States themselves might otherwise finance." *Id.* at 50. In that case, the Port Authority argued that a judgment against it "produces an effect equivalent to the impact of a judgment directly against the State" because it reduces the "Authority's surplus available to fund such projects" such that the State would otherwise have to pick up the tab. *Id.* But the Supreme Court rejected the argument:

> This reasoning misses the mark. A charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder. But none would conclude, for example, that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' Eleventh Amendment immunity. **The proper focus is not on the use of profits or surplus, but rather is on losses and debts.** If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness

18

of the enterprise? **When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated.**

*Id.* at 51 (emphases added).

Here, Plaintiff and the proposed Class can be made whole without resorting to the "public funds" in the State's treasury. Given that New Jersey has over $6 billion in unclaimed properties "waiting to be claimed," it is simply implausible to suggest that the Unclaimed Property Fund lacks the resources to make Plaintiff and the proposed Class whole without resort to the state treasury.

The relief sought here would stem from the unclaimed property fund. AC ¶ 121; *see also* AC ¶¶ 115–121. For the reasons discussed above, recovery from this fund, which is distinct from the State treasury and which uses only income derived from the properties it escheats and liquidates, does not run afoul of the Eleventh Amendment. Moreover, such a recovery is entirely consistent with the purpose and the framework of the fund because it is supposed to be "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c).

## C.    The Requested Relief Is Permissible Under *Ex parte Young*

Even if the Court finds that the unclaimed fund implicated the Eleventh Amendment, the *Ex parte Young* exception applies. The doctrine of *Ex parte Young* holds that 'a state official is stripped of his official or representative character' and

19

thereby deprived of the State's immunity, *Ex parte Young*, 209 U.S. 123, 159–60 (1908), when he commits an 'ongoing violation of federal law.'" *Waterfront Comm'n of New York Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (quoting *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011). Defendants admit that "there may be circumstances in which a property owner could allege an ongoing violation and seek prospective, non-monetary relief within the narrow doctrine established in *Ex parte Young*." MTD at 18.

This is just such a case where *Ex parte Young* relief is available. Plaintiff seeks prospective injunctive relief falling squarely within the *Ex parte Young* exception, including alterations to the way that the NJUPA is administered to ensure notice is provided in a manner that complies with due process requirements. *See* AC Prayer for Relief ¶ A–B (New Jersey should provide notice "reasonably calculated" to reach owners prior to seizing property).

Plaintiff, on behalf of himself and the proposed Class, "seeks an accounting and the return of their own escheated property in the possession of the State." AC ¶ 114. The Eleventh Amendment does not bar such relief, as nothing sought by the Amended Complaint can fairly be called damages against the State. Even for the seized property that New Jersey has liquidated or moved to its general fund, sovereign immunity does not apply because Plaintiff explicitly seeks to be made whole not from the treasury but from the Unclaimed Personal Property Trust Fund,

20

*see* AC ¶ 121, which is statutorily designed for cases such as this; as it is explicitly "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey," N.J.S.A. § 46:30B-74(c) .

The Eleventh Circuit recently resolved a similar issue in favor of Plaintiff's position here. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333–34 (11th Cir. 2025). Like Defendants here, the state of Florida argued that the prospective relief the *Maron* plaintiffs requested was a request for retrospective relief. *Id.* at 1333. The Eleventh Circuit rejected that argument and held that the *Ex parte Young* exception applied to the state's seizure of a refund owed to the *Maron* plaintiffs because they had "alleged an ongoing violation of federal law—that the State has appropriated their refund and failed to give them just compensation. And they sought prospective relief—that the district court declare a part of the Act unconstitutional for precluding recovery of just compensation and that it order the State to pay just compensation when they later file a claim." *Id.* That same reasoning is squarely applicable here.

## II.   PLAINTIFF HAS STANDING TO SUE

### A.   Plaintiff Has Alleged an Actual and Imminent Injury

Defendants argue that Plaintiff lacks standing and his claims are unripe due to the absence of an actual or imminent injury. MTD at 21. Defendants' argument (a) ignores allegations showing that injury has *already* occurred, (b) mischaracterizes

21

allegations demonstrating a sufficient likelihood of *future* injury, and (c) overlooks that efforts necessary to avoid future injury (such as the monitoring and "churning" alleged here) constitute *present* injury for the purposes of Article III.

First, and most glaringly, Defendants entirely fail to grapple with the allegations that Plaintiff has *already* suffered textbook Article III injury. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or **monetary injury** to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." (emphasis added)); *Knellinger v. Young*, 134 F.4th 1034, 1042 (10th Cir. 2025) ("[A]n uncompensated taking is a classic example of a financial harm sufficient to confer standing.") (citing *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636–37 (2023)). Specifically, Defendants ignore the crux of Plaintiff's claim: that he has received only $487,581.23 from the Administrator for stocks worth at least $623,936, reflecting a six-figure monetary loss. *See* AC ¶¶ 84–100.

Second, the Amended Complaint contains allegations demonstrating a sufficient likelihood of future injury, *id.* ¶¶ 101–12, which need not be a certainty. Indeed, "even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.23 (2007) (quoting *Village of Elk*

*Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)). And where "the threatened acts that will cause injury are authorized or part of a policy," as is the case here, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).

For example, in *Pennell*, the Supreme Court found that landlords had standing to enjoin a city ordinance that would prohibit rent increases found to cause an "unreasonably severe financial or economic hardship" on tenants—even though the landlords had not shown several future events: (1) that they intended to raise their rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's officials would find against the landlords. *Pennell v. City of San Jose,* 485 U.S. 1, 6 (1988). The Supreme Court nevertheless held that the *Pennell* plaintiffs demonstrated a "realistic danger of sustaining a direct injury as a result of the statute's operation," which was sufficient for Article III standing. *Id.* at 8. Here, even more so than in *Pennell*, there is a "realistic danger" that harm will occur. Specifically, the operative complaint explains that "Plaintiff continues to suffer ongoing injury from the NJUPA in three ways: (1) he has additional property that is likely to be escheated without notice; (2) he must make efforts to prevent that, which is its own injury; and (3) he is deterred from acquiring additional property because of the unclaimed property regime." AC

23

¶ 101; *see also id.* ¶¶ 97, 102–112. Defendants' arguments as to all three injuries are cursory and unavailing.

Regarding the future injury: The Amended Complaint alleges that "Plaintiff is the owner of and legal representative for additional property vulnerable to seizure and taking under the NJUPA." *Id.* ¶ 102. "Plaintiff holds his Exxon shares at a brokerage called TradeUp Securities, which is a New Jersey corporation." *Id.* ¶ 104. "Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile—not a state with an escheat law within the meaning of Section 46:30B-10(d)." *Id.* "And Plaintiff intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come." *Id.* Thus, because Plaintiff's last known address is not in a "state" that would escheat his property, the NJUPA will require TradeUp (a New Jersey Domiciliary) to escheat the property. *Id. See State v. Garford Trucking, Inc.,* 72 A.2d 851, 854 (1950) ("A corporation created and existing under the laws of New Jersey may have a 'commercial domicile' or 'business situs' elsewhere for taxation and other purposes; but it is nonetheless domiciled and resident in the state of its creation . . .")." *Id.*[3]

---

[3] Property may be subject to escheat under the NJUPA if "the holder is a domiciliary" of New Jersey and the "last known address . . . of the apparent owner is in a state that does not provide by law for the escheat or custodial taking of the property," N.J.S.A. § 46:30B-10(d). "Holder" is defined as "a person, wherever organized or domiciled, who is the original obligor indebted to another on an obligation." N.J.S.A. § 46:30B-6(g).

Critically, under the NJUPA, stocks are deemed abandoned if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account like automatic dividend reinvestment. *See* N.J.S.A. §§ 46:30B-7.1, 46:30B-31. Accordingly, it is ***certain that Plaintiff's shares will escheat*** to New Jersey unless Plaintiff takes action regarding his property in such a way that New Jersey requires to toll escheatment. *See generally* AC ¶¶ 104–07. And, as explained in the amended complaint and fact section above, it is at least very likely that Plaintiff—who lives in Santiago, Chile—will not receive notice before (or after) that escheatment.

This demonstrates a sufficient likelihood of two forms of future harm. First, "the denial of a constitutional right"—here, the seizure of property without pre-deprivation notice reasonably calculated to reach owners—"constitutes irreparable harm," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). No post-deprivation process nor even a "damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). Second, "[w]hen [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost which are not compensable in money damages."

25

*Taylor v. Chiang*, CIV. S-01-2407 WBS GGH, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). For example, "the owner is deprived of the right to vote his or her shares in important matters of corporate governance." *Id.*

Nothing about these harms "depends upon several highly speculative events." MTD at 24. Defendants cite *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) and *Peters v. Cohen*, No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025). But *Clapper* found it too speculative that a government department would decide to seek permission of "the Foreign Intelligence Surveillance Court" to access their private communications, something the challenged law did not require said department to do. *Clapper*, 568 U.S. at 413. Here, not only has the State already seized Plaintiff's property, but the NJUPA *requires* the Administrator to seize Plaintiff's property again if he simply allows his shares to sit in his TradeUp account for longer than three years without additional action. *See* NJSA. §§ 46:30B-7.1; 46:30B-31. And the *Peters* court questioned the likelihood that California would seize shares of stock in a **_German_** brokerage account. *Peters*, 2025 WL 733237, at *1. TradeUp is a New Jersey corporation on which the NJUPA unquestionably imposes escheatment obligations, AC ¶ 104, and New Jersey has previously seized Exxon stocks from Plaintiff before.

Defendants argue that for harm to befall Plaintiff (1) he must fail to act upon pre-escheat notices provided by TradeUp—including additional notifications not

26

mandated by the Act, but which TradeUp might extra-legally provide to Vial; (2) Vial's stock must actually be reported and remitted to UPA; (3) Vial must fail to claim the property within one year of escheat (which would allow him to recover his stock before liquidation); and (4) Vial must then demonstrate that such remittance injured him in a concrete way. MTD at 24.

But this argument rests on an assumption that ignores the crux of this case: Plaintiff—as an overseas owner—will ***certainly not*** receive notice under the NJUPA. The only pre-escheat notice required is that holders should send notice via certified mail, but that is unavailable overseas. AC ¶¶ 61–63. And the post-escheat publication notice is only made in New Jersey newspapers. AC ¶ 65. This argument also impermissibly speculates (with no basis) that TradeUp will issue notices to Plaintiff that do not comply with the NJUPA despite the NJUPA imposing no such obligation. *See* MTD at 22–23. In short, injury will occur even if all involved comply with the statute—and Defendants' argument only demonstrates the importance of due process.

Defendants further argue that "Plaintiff may easily prevent escheat . . . by writing a letter to the holder every 3 years," *id.* at 24–25 (citations omitted). But a "party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation," *Flowers*, 547 U.S. at 232 [BVI](internal quotation marks and citations omitted). More importantly, requiring that Plaintiff take actions he

27

otherwise would not take, or else have his property seized without adequate notice, proves *__present__* injury and, therefore, standing because it means Plaintiff would be forced to take efforts to prevent the future injury from occurring. The Ninth Circuit recognized Article III standing for this reason in an unclaimed property case: "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include . . . the cost of having to constantly monitor their property to avoid escheat," including by "'churning' their property so that it stays active and avoids escheat," *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007).

The Supreme Court has also recognized that a risk of future injury—even one predicated on future events that may not occur—creates *__present injury__* in the form of prevention efforts. For example, in *Monsanto Co. v. Geertson Seed Farms*, a group of conventional alfalfa growers sought injunctive relief against an agency decision to deregulate genetically engineered alfalfa. 561 U.S. 139, 152 (2010). They claimed that deregulation would harm them because their neighbors might plant the genetically engineered seed, the bees might obtain pollen from the neighbors' plants, and then the bees might (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. *Id.* Without expressing views about the probability of future contamination harm coming to pass, the Supreme Court found standing because the plaintiffs would suffer *__present__* harm by trying to avoid or mitigate the

28

threat. *Id.* at 154–55. The plaintiffs "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and take other "measures to minimize the likelihood of potential contamination." *Id.* The Court held: "Such harms, which respondents ***will suffer even if their crops are not actually infected*** with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.* at 155 (emphasis added). In sum, the fact that Plaintiff is compelled to monitor or churn his property to *prevent* escheatment demonstrates *current harm. Accord Pic-A-State Pa., Inc. v. Reno,* 76 F.3d 1294, 1300 (3d Cir. 1996) (plaintiffs had standing due to law creating need to change their "business practices").

## B.    Plaintiff's Injury Is Fairly Traceable to Defendants' Actions

Defendants make the strained argument that Plaintiff's injury here is self-inflicted and, thus, not fairly traceable to the State. MTD at 25–27. They argue that Plaintiff could have avoided the harm the State inflicted by taking one of the actions the NJUPA specifies to reset the timer on escheat. *Id.* at 26. But Plaintiff cannot be faulted for not taking specific action to avoid an unconstitutional statute in a state thousands of miles away to which they have no nexus—particularly when Plaintiff has received no notice. As explained above, Defendants' argument merely confirms standing, because it is another way of demonstrating that the NJUPA imposes a

29

burden to take certain steps (such as monitoring or churning an account) in order to avoid unconstitutional seizure of property without notice.

Defendants' argument primarily rests on two inapposite cases: *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019), and *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378 (5th Cir. 2018). Neither case supports their position. *Cordoba* found that a consumer who fails to place her name on the do not call registry cannot trace the injury of telemarketing calls to the telemarketers. *Cordoba*, 942 F.3d at 1271–72. But in that case, the violation was specifically limited to when telemarketers "solicit[ed] residential telephone subscribers who have registered their numbers" on the National Do Not Call Registry. *Id.* at 1265. In other words, the statute itself required the consumer to register first, and that registration is what made the soliciting calls illegal in the first place. Therefore, the injury was not "fairly traceable to the challenged action of the defendant," *id.* at 1268, without that prerequisite being fulfilled. Here, by contrast, there is no requirement that a property owner do *anything* for the State to have constitutional due process notice obligations.

*Zimmerman* too is inapposite. In that case, a candidate challenged a campaign contribution limit, but he "did not take steps towards reaching or exceeding the aggregate limit of the kind that would demonstrate a serious intent to violate the statute." 881 F.3d at 389. Because there was no evidence that he would have been able to raise and accept a sufficient number of donations to face even possible

30

prosecution, he failed to show an injury fairly traceable to the challenged law. *Id.* at 390. Plaintiff is not in a position like Zimmerman, who had only alleged only half of what would bring him into conflict with the challenged law. Plaintiff's property has *already* been seized by the State (*see* AC ¶¶ 84–93), the NJUPA has already denied him just compensation (*id.* ¶ 97), and he has shown that the NJUPA creates an actual and non-speculative risk that his injury will recur in the future with respect to his remaining Exxon Mobil stock held in Tradeup, *id.* ¶¶ 102–07.

## III.    PLAINTIFF'S NOTICE CLAIMS ARE TIMELY

The Amended Complaint contains an entire section titled "The Statutes of Limitations Have Not Run, And In Any Case Have Been Tolled." AC ¶¶ 122–25. In that section, Plaintiff explained, *inter alia*, that his "legal claims did not fully accrue until November 8, 2023, when the Administrator issued its final sum from the Unclaimed Property Administration, thus making a final determination." *Id.* ¶ 122. "Prior to that date, Plaintiff did not know the total amount he would receive from the property that was taken—and therefore did not know that he would not be made whole." *Id.* "At the absolute earliest, the statute of limitations would run from November 6, 2023, the date of the letter from the State indicating what amounts would be paid from which shares." *Id.*

Defendants ignore all of these allegations and impermissibly rely on facts not found in the Amended Complaint to assert that the statute of limitations began in

31

2016, because "in December 2016, Vial knew or should have known that the State was holding Borquez's property and that he and other heirs allegedly had not received prior notice of its remittance." MTD at 29 (citing ECF No. 21-2 ¶¶ 12, 15, 16, 18 (Vial Decl. in Support of PI Motion). But the Third Circuit has repeatedly made clear that this Court cannot consider such materials on a motion to dismiss. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016) (reversing grant of motion to dismiss because the "District Court here based its decision to dismiss not only upon the allegations in the Complaint but also, it appears, upon testimony given at the hearing and the supplemental declarations filed by" plaintiffs). In short, when "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (cleaned up).

In any case, the statute of limitations clock did not start until the administrative process culminated in a final determination. As explained in the Amended Complaint, "Plaintiff was actively engaged in an administrative process to retrieve the escheated shares, including by submitting more information and paperwork as requested." AC ¶ 123. That process did not conclude until Plaintiff received the State's determination letter in November 2023. *See, e.g., Calderon v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 756 F. Supp. 181, 184–85 n.4 (D.N.J. 1990) (the statute of limitations ran from the "final notice of determination in this matter").

32

Until that time, it was not clear whether Plaintiff would recover or the extent of his recovery. Indeed, if Plaintiff had filed this lawsuit in 2018 (when Defendants now argue the statute of limitations expired), Defendants would doubtlessly have argued that the claims were unripe because the Administrator had not yet issued a final decision with respect to the compensation he would receive.

## IV. PLAINTIFF BRINGS A FACIAL CHALLENGE TO THE NJUPA WITH RESPECT TO FOREIGN PROPERTY OWNERS

Defendants argue that Plaintiff cannot mount a facial challenge to the NJUPA. MTD at 31. But Plaintiff challenges the NJUPA scheme both as applied to Plaintiff and on its face with respect to other foreign property owners, who are systematically denied constitutionally adequate notice under the Statute prior to the seizure of their property. With respect to the class of foreign property owners, the Act is unconstitutional in every instance because it systematically fails to provide them with any constitutionally adequate notice at all.

## V. PLAINTIFF HAS PROPERLY STATED A TAKINGS CLAIM

Defendants argue that Plaintiff's Takings claim fails as a matter of law because Plaintiff cannot "demonstrate that the state's action affected its legally cognizable property interest." MTD at 34 (internal quotation marks and citations omitted). But "[w]hen a state directly appropriates private property, it is considered a *per se* taking, and the state has a duty to compensate the owner." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). "The

33

owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). Here, Plaintiff has not been "put in the same position" because, but for the State's seizure of his stocks, Plaintiff would have had stocks worth over $623,936 instead of the $487,581.23 returned. AC ¶ 97. The failure to pay compensation for the lost appreciation of property violates the longstanding rule under the Fifth Amendment that a property owner must be put "'in as good a position pecuniarily as if his property had not been taken.'" *United States v. 564.54 Acres Land*, 441 U.S. 506, 510 (1979) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). Plaintiff has received only a fraction of the value of his property from the State of New Jersey. *See* AC ¶ 97. The property of thousands of proposed Class members has been taken in its entirety, without any notice. That they may pursue an administrative process to recoup some of their losses is irrelevant under the Takings Clause because the State's duty to pay just compensation under the Takings Clause "arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Knick v. Township of Scott, Pa.*, 588 U.S. 180, 181 (2019).

Additionally, Plaintiff and Class members who had owned stocks were deprived of more than mere cash. "When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, … or the

34

ability to sell the securities." AC ¶ 49; *see also, e.g., Taylor v. Chiang*, CIV. S-01-2407 WBS GGH, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). ("When [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost" including "the right to vote his or her shares in important matters of corporate governance.").

Defendants contend that Plaintiff is not entitled to the appreciated value of his property, MTD at 34–35, but, as discussed above, that contention is foreclosed by Supreme Court precedent holding that the "owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16; *see also 564.54 Acres Land*, 441 U.S. at 510.

Moreover, the cases Defendants cite in support of their position are inapposite and themselves rely on one circuit panel's precedent for their holdings. *Suever v. Connell*, 579 F.3d 1047, 1059–60 (9th Cir. 2009), and *Peters v. Cohen*, No. 24-1040, 2025 WL 733237, at *2 (9th Cir. Mar. 7, 2025), each simply rely on the holding in *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005), for this position without engaging in any additional reasoning on the issue. But the *Taylor* court never actually considered the issue of whether a plaintiff who has suffered a constitutional taking should be forced to bear the loss of the actual property and receive only the value of the property the state realized when it liquidated the property. And in *Suever*, 579 F.3d at 1059–60, the Ninth Circuit opined that the plaintiffs were not

35

entitled to receive more than the actual cash proceeds realized by the State from the sale of stock; but that case involved plaintiffs who "'have failed to meet their burden to show as a matter of undisputed fact that seizures of property outside the scope of the [Unclaimed Property Law] have occurred.'" *Id.* at 1058. Here, by contrast, Defendants failed to provide Plaintiff with any constitutionally required notice at all.

Defendants also rely on *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982), in which the Supreme Court examined a situation where an owner failed to use his mineral leasing rights for decades, which were deemed lapsed. *See* MTD at 35. However, that was not a Takings case because the statute did not take private property for public use at all but merely allocated the ownership of unexploited mineral interests between private parties, *id.* at 519. Moreover, the *Texaco* plaintiff was provided full procedural due process, whereas here Plaintiff was not even provided notice prior to seizure by the State.

Most importantly, as the Supreme Court recently emphasized in analyzing *Texaco*: "It is the owner's failure to make any use of the property—and for a lengthy period of time—that causes the lapse of the property right." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 647 (2023) (citation and quotation omitted). However, this is ***not a case of neglect or "failure to make any use of the property"*** because pursuing a buy-and-hold strategy for stocks is not akin to sleeping on mineral *leasing* rights for decades. Just owning a stock and doing nothing more *is* making use of that

stock. One can collect dividends, or simply hope the stock appreciates in value over time or even hope that its value skyrockets at some point in the future due to a particular catalyst. Indeed, many great investors buy stocks only to hold them for decades. *See, e.g.,* Warren E. Buffett, *Chairman's Letter* (1996), available at https://www.berkshirehathaway.com/letters/1996.html ("If you aren't willing to own a stock for 10 years, don't even think about owning it for 10 minutes."). In short, Plaintiff *was* making use of his property when New Jersey seized it without constitutionally adequate notice.

## VI.    BURFORD ABSTENTION IS INAPPLICABLE TO THIS CASE

Defendants' invocation of the *Burford* abstention doctrine is not well taken. Their own description of the doctrine eschews its application to a case such as this:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

MTD at 37 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* (*"NOPSI"*), 491 U.S. 350, 361 (1989)). In fact, *NOPSI* held that *Burford* abstention did **not** apply where a case did "not involve a state-law claim, nor even an assertion that the federal claims are 'in any way entangled in a skein of state-law that must be

37

untangled before the federal case can proceed.'" *Id.* at 361 (citation omitted). Here, both claims are federal claims under 42 U.S.C. § 1983 and the U.S. Constitution. And there are no doubts about the application of state law here, the plain language of which has no ambiguity. Just because the NJUPA contains an administrative process which was already followed here, AC ¶¶ 122–23, or just because some portions of the NJUPA may be deemed unconstitutional, are insufficient reasons for this Court to abstain. *See id.* at 362 (*Burford* "does not require abstention whenever there exists such a [state administrative] process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy") (citation omitted).

In the Third Circuit, courts undertake a two-step analysis to determine whether *Burford* abstention is appropriate. "The first question is whether timely and adequate state-court review is available. If such review is available, the District Court next considers whether the case (1) implicates a regulatory scheme that involves a matter of substantial public concern; (2) whether it is the sort of complex, technical regulatory scheme to which the *Burford* abstention doctrine usually is applied; and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Empire Abrasive Equip. Co., LP v. Acceptance Ins. Co.*, 302 F. Supp. 3d 687, 694 (E.D. Pa. 2018) (cleaned up).

38

While review in New Jersey state court would be available here, there is no "difficult question[] of state law" at issue in this case. *NOPSI*, 491 U.S. at 361. Rather, this case concerns whether a state law violates the United States Constitution. "The interpretation of [NJUSA] in this case does not require consideration of any other [New Jersey] statute and the relevant facts are simple and undisputed." *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 365 (3d Cir. 1986).

Second, "the [Administrator] has not suggested any peculiar local conditions or special expertise required to interpret the statute. The state proceeding merely involves reading and construing a statute, a task for which courts are best equipped, and not administrative factual determinations, such as are involved in the setting of a proper utility rate." *Id.* And there is no "specialized state tribunal," *id.* at 364, indeed, the state court would largely be construing the requirements of federal constitution, a matter with which New Jersey can hardly claim a peculiar interest.

This is indisputably not the sort of regulatory scheme to which *Burford* is usually applied. Defendants' inability to point to even a single instance of a federal court refusing to hear a case regarding a state's unclaimed property regime based on *any* abstention doctrine is itself extremely telling. *See Univ. of Md. at Balt. v. Peat Marwick Main & Co.*, 923 F.2d 265, 271 (3d Cir. 1991) (weighing the fact that no other cases had applied *Burford* under similar circumstances against abstention). Defendants do not even point to a case concerning an alleged taking. Rather,

39

Defendants argue that unclaimed property regimes are "of local concern." MTD at 38. However, here, New Jersey seized property belonging to a family *in a different hemisphere of the globe* that has zero nexus to New Jersey.

There is no interference with New Jersey's ability to maintain a coherent regulatory policy. Again, there is no dispute over how to construe any provision of the NJUPA. Thus, there is zero risk of inconsistent interpretations. Moreover, rendering the NJUPA's notice provisions and compensation provisions compliant with the U.S. Constitution is not akin to dismantling the entire statute. Simply put, this is not "the sort of complex technical regulatory scheme to which the *Burford* abstention doctrine usually is applied." MTD at 37 (quoting *Chiropractic Am. v. LaVecchia*, 180 F.3d 99, 105 (3d Cir. 1999)).

## CONCLUSION

For the preceding reasons, Defendants' Motion to Dismiss should be denied, and this case should proceed to discovery.

Dated: July 7, 2025                     Respectfully submitted,

By: */s/ Kevin P. Roddy*
WILLENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ.
(NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

40

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
Matthew E. Layden, Esq.
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452
Email: jmassey@masseygail.com
Email: bvallacher@masseygail.com
Email: mlayden@masseygail.com

41

## CERTIFICATE OF SERVICE

I, Kevin P. Roddy, hereby certify that on this 7th day of July 2025, caused the foregoing Response Memorandum in Opposition to Defendants' Motion to Dismiss to be served on Defendants which effected service on all counsel of record.

*/s/ Kevin P. Roddy*