NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION,<br><br>      Defendants. | Civil Action No. 24-11301 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon the Motion to Dismiss by Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"), brought under Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). ("MTD," ECF No. 49.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## I.    BACKGROUND

    After Rene Correa Borquez ("Borquez") died in Chile in May 2006, his 905 shares of Exxon Corporation stock allegedly escheated to the New Jersey Unclaimed Property Administration (the "Administration") without notice. ("AC," ECF No. 45. ¶ 84–90.) Plaintiff

Jaime[1] Vial ("Plaintiff"), Borquez's descendent and "legal representative," submitted a claim for the return of this stock under the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.* (the "Act" or "NJUPA"). Although the stock had already been sold pursuant to the statute, the NJUPA allowed Plaintiff to collect—"at *any time in perpetuity*," *Clymer v. Summit Bancorp.*, 792 A.2d 396, 400 (N.J. 2002) (emphasis added) (citing N.J. Stat. Ann. § 46:30B-77)— "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator," an amount totaling nearly $500,000, N.J. Stat. Ann. §§ 46:30B-79, -68; (AC ¶¶ 93–94.) Plaintiff, dissatisfied with this amount, brought this putative class action almost two decades after Borquez's death to seek more, as well as to enjoin the administration of the NJUPA wholesale. (ECF No. 1; *see generally* AC, Prayer for Relief.) Because this Court lacks jurisdiction to decide Plaintiff's claims, however, for the reasons set forth herein, his Amended Complaint must be dismissed.

### A.    THE NEW JERSEY UNIFORM UNCLAIMED PROPERTY ACT

New Jersey, like forty-nine states and the District of Columbia, has unclaimed property or 'escheat' laws. *See Am. Express Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 567 (D.N.J. 2010), *aff'd*, 669 F.3d 374 (3d Cir. 2012). Escheat and the related common law doctrine of *bona vacantia*—allowing states to "take control and dispose of abandoned property"— have long histories dating back to feudal English common law. *See Simon v. Weissmann*, 301 F. App'x 107, 110 (3d Cir. 2008). "As a broad principle of jurisprudence rather than as a result of the evolution of legal rules, it is clear that a state, subject to constitutional limitations, may use its

---

[1] Plaintiff's first name appears to be misspelled in the case caption on CM/ECF. The spelling as written in Plaintiff's filings is "Jaime," while the spelling on the docket is "Jamie." The Court uses the spelling as written by Plaintiff himself both here and in the caption of this Opinion.

legislative power to dispose of property within its reach, belonging to unknown persons." *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 436 (1951). New Jersey's Unclaimed Property Administration effectuates this power through the NJUPA, N.J. Stat. Ann. § 46:30B-1 *et seq.*

In administering the NJUPA, the Administration "largely relies on self-reporting for remittance" of abandoned property. *Salvato v. Harris*, No. 21-12706, 2022 WL 1224962, at *3 (D.N.J. Apr. 26, 2022). As the Honorable Freda L. Wolfson, U.S.D.J., explained in *American Express Travel Related Services Company*:

> The laws of most states are based upon a version of the Uniform Unclaimed Property Act ("UUPA"). The Court notes that the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner. In the usual course, when property is deemed abandoned, the holder of most types of property is required to attempt to contact the owner, using the name and last known address, and if possible, return the property. If the attempt is unsuccessful, the holder turns over the abandoned property to the state and provides the state with the name and last known address of the owner.[2]

755 F. Supp. 2d at 565. Under the NJUPA, these self-reporting "holders"—typically private individuals charged with holding the property of someone else—are required under the Act to annually report their possession of and, if necessary, remit unclaimed property to the Administration. N.J. Stat. Ann. § 46:30B-6(g) (defining holder); *id.* § 46:30B-46 (requiring

---

[2] The following example illustrates New Jersey's escheatment process: Jane Doe owns stock with a New Jersey-based brokerage firm. Ms. Doe would be an "owner" under the NJUPA and the brokerage firm would be a "holder." N.J. Stat. Ann. §§ 46:30B-6(g), (k). If, after three years, Ms. Doe does not sufficiently indicate her continued interest in that stock to the brokerage firm in ways indicated by the NJUPA, *id.* § 46:30B-31, and the brokerage firm is unable to communicate in certain ways with Ms. Doe, *id.* §§ 46:30B-7.1, -33, the brokerage firm must report and eventually remit Ms. Doe's stock to the NJUPA Administration, *id.* §§ 46:30B-49, -57. Now in possession of Ms. Doe's stock, the Administration must provide notice of the sale to Ms. Doe through newspaper listings and online. *Id.* §, -51; *See Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. After a one-year waiting period, the Administration must then sell the presumed-abandoned stock and hold the sale proceeds in trust for the owner. *Id.* §§ 46:30B-69, -71(c). Ms. Doe, upon learning of this escheatment and sale, may then submit a claim—"at any time in perpetuity"—with the Administration to recover the proceeds of this sale plus interest and accrued dividends. *Id.* §§ 46:30B-72, -79, -68; *Clymer*, 792 A.2d at 400.

reports); *id.* § 46:30B-49 (requiring reports due November 1 of each year); *id.* § 46:30B-57 (requiring holder to remit property).

This property can include "stock or other evidence of ownership of an interest in a business association or financial organization." *Id.* § 46:30B-6(r). To determine whether an interest in a business is "abandoned," the NJUPA specifies certain triggering events that begin a three-year clock after which such property is presumed abandoned. *Id.* § 46:30B-31. Specifically, these triggering events include, among others, uncashed dividends, certain undelivered stock certificates, or with automatic reinvestment plans, a second "mailing of a statement of account or other notification or communication" returning as "undeliverable."[3] *Id.* Even if this three-year abandonment period is met, stock is not deemed abandoned if the holder has certain contact with the owner. *Id.* §§ 46:30B-7.1, -33.[4]

Between 60 to 120 days before the holder files a report addressing presumably abandoned property, the holder must "send by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address informing the owner that the holder is in

---

[3] In addition to the second failed mailing or notification, Section 31 presumes that property is abandoned with automatic reinvestment plans "after the holder discontinued mailings to the apparent owner." N.J. Stat. Ann. § 46:30B-31.

[4] The NJUPA does not exhaustively list the forms of communication between owner and holder that are sufficient for property to not be presumed abandoned. NJUPA Section 31 governs when the presumption of abandonment applies to stock. N.J. Stat. Ann. § 46:30B-31. As described hereinabove, the scenarios contemplated by this section include the owner failing to take certain action with the stock or mail—"or other notification or communication"—returning as undeliverable within three years. *Id.* However, Section 31 does not list what these "other" notifications or communications include. Similarly, NJUPA Section 7.1 outlines a non-exhaustive list of owner actions that, if done, indicate the property "shall not be presumed abandoned" and will not be escheated. *Id.* § 46:30B-7.1. First, Section 7.1 specifies that the owner may communicate with the holder "in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder," although without explaining what forms of communication are acceptable. *Id.* Second, owners can undertake some action to "indicate[] an interest in the property," which includes, *inter alia,* "owner-directed activity in the account in which the property is held." *Id.* As such, although Sections 31 and 7.1 indicate some of the options available to owners to prevent escheatment, neither appears exhaustive. Moreover, neither the NJUPA nor New Jersey caselaw defines what qualifies as a "communication" sufficient for property to not be presumed abandoned. *See id.* § 46:30B-6 (no definition for "communication").

possession" of their property if (1) that address is accurate, (2) the apparent owner's claim is not barred by the statute of limitations, and (3) the property is worth more than $50. *Id.* § 46:30B-50. The statute makes no exceptions for contacting foreign addresses or citizens outside the reach of certified mail. *See Certified Mail® - The Basics*, U.S. Postal Serv. (Sept. 26, 2025), https://faq.usps.com/s/article/Certified-Mail-The-Basics. The NJUPA requires each of these pre-escheatment notice procedures be undertaken by the *holder*, not the Administration or State of New Jersey.

If these collective outreach efforts fail and the Administration escheats the property, the NJUPA requires that most property be sold within three years of receipt, except for most securities which must be held for only one year before sale. N.J. Stat. Ann. §§ 46:30B-69, -72. When liquidated, the proceeds of these sold stocks are then held by the Treasurer and her designated Administrator in the Unclaimed Personal Property Trust Fund (the "Trust Fund"). *Id.* § 46:30B-71(c). Unless the Administrator "deems it prudent and advisable to do otherwise," 75 percent of all funds received in the Trust Fund are transferred to New Jersey's General State Fund. *Id.* The remaining 25 percent "shall be retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* When an owner submits a claim for the return of their property, the Administrator "must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims," because "all unclaimed funds are held by the Treasurer as trustee for the public interest." *Salvato*, 2022 WL 1224962, at *6 (quoting *Clymer*, 792 A.2d at 400).

To facilitate this reunion process, the NJUPA also provides owners post-escheatment notice. The Administrator is required to publish the name and address of the property owner in a

"newspaper of general circulation in the county" of that last-known address "once a week for two consecutive weeks" by November 30 of the year following the sale of the escheated property.[5] *Id.* § 46:30B-51. Such notice, however, is only required for property valued $100 or more. *Id.* In addition, the Administrator also posts information about escheated property to its searchable Unclaimed Property database, containing similar information about the property. *Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. This database also links to MissingMoney.com, where searching owners can seek unclaimed property in a national database provided in partnership with the National Associations of State Treasurers and Unclaimed Property Administrators. *See MissingMoney.com*, https://missingmoney.com/.

The Administrator must pay valid claims from property owners seeking their escheated property. N.J. Stat. Ann. § 46:30B-77. In the event the Administrator is still in possession of an abandoned security—even after the one-year waiting period—an owner is entitled to the actual security itself. *Id.* § 46:30B-72. Furthermore, if the Administrator allows such a claim on previously liquidated stock, the owner-claimant is entitled to more than just the value at liquidation. The claimant receives "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator" at an interest rate fixed by the Administrator.[6] *Id.* §§ 46:30B-79, -68.

---

[5] The NJUPA's confidentiality provision limits the sharing of any information beyond name and address. N.J. Stat. Ann. § 46:30B-76.1.

[6] Although Plaintiff appears to suggest that the NJUPA-authorized amount "fails to account for . . . dividends[] or interest," (AC ¶ 159), Plaintiff's assertion is refuted by the language of the NJUPA, *see* N.J. Stat. Ann. §§ 46:30B-68, -79. Plaintiff does not otherwise allege that Defendants failed to pay him what he was owed pursuant to the NJUPA, and the Court need not accept Plaintiff's plainly foreclosed interpretation of the NJUPA as true at this stage. *See Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

### B.    FACTUAL BACKGROUND

Defendants, New Jersey state officials sued in their official capacities for their respective roles in administering the NJUPA, filed the instant Motion to Dismiss Plaintiff's Amended Complaint.[7] (MTD; AC.) Plaintiff, a Chilean citizen, (AC ¶ 24), brought this putative class action on behalf of himself and as the "legal representative" of the heirs of Rene Correa Borquez ("Borquez"),[8] a Chilean citizen and lawyer, (*id.* ¶¶ 84–85.) On May 27, 2006, Borquez died testate in Chile, leaving the entirety of his estate to his brother, Hernan Correa Borquez ("Hernan"), also in Chile. (*Id.* ¶ 86.) Included in Borquez's estate were 905 shares of then-Exxon Corporation (now Exxon Mobil Corporation) stock.[9] (*Id.* ¶ 92.) Hernan died in Chile on December 22, 2007, with all of his heirs residing in Chile. (*Id.* ¶ 87.)

No one in the Borquez family received these shares. At some unspecified point following Borquez's death in 2006, the Administrator of the NJUPA,[10] "escheated Mr. Borquez's investments without providing any notice to the Borquez [f]amily." (*Id.* ¶ 89.) Plaintiff alleges that Defendants provided no notice whatsoever "before or after the escheatment" of the Exxon stock. (*Id.* ¶ 90.) After learning of the escheatment, Plaintiff, acting on behalf of all of Borquez's heirs,

---

[7] The Court accepts all factual allegations in the Amended Complaint as true for purposes of deciding the motion. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[8] Plaintiff alleges that "[a]ll of the heirs of Mr. Borquez empowered Plaintiff Vial under Chilean law to recover Mr. Borquez's property unlawfully seized by state governments in the United States." (AC ¶ 24.) Further, Plaintiff states that the State of New Jersey and Defendants recognize him "as the rightful legal representative to seek the return of the seized property belonging to Rene Correa Borquez." (*Id.*) While Plaintiff is not specific as to what this representative capacity is under Chilean law—executor, will beneficiary, or otherwise—the Court accepts Plaintiff's assertions about his representative authority as true at this stage.

[9] Although Plaintiff explains that he currently owns stock with a New Jersey-based brokerage firm TradeUp Securities, (AC ¶ 20), he does not specify the entity responsible for holding Borquez's Exxon stock.

[10] Plaintiff does not allege when this escheatment occurred, nor does he specify who the NJUPA Administrator was when Borquez's stock was escheated. (*See* AC ¶¶ 89, 92.)

submitted a claim with the NJUPA Administrator for the return of the Exxon stock.[11] (*See id.* ¶ 93.) On November 6, 2023, the Administrator concluded the NJUPA review process and determined that Plaintiff was owed $487,581.23.[12] (*Id.* ¶¶ 93–94.) Plaintiff received this sum two days later, but no stock. (*Id.* ¶ 94.) At some unspecified time after the escheatment, the Administration had liquidated the Exxon shares. (*Id.* ¶ 97.) Plaintiff alleges that that stock, had it not been sold, would be worth $623,936 when he initiated this lawsuit on December 19, 2024. (*Id.* ¶ 157 n.14.)

In his Amended Complaint, Plaintiff—in both his individual capacity and as representative of the Borquez estate—asserts two causes of action pursuant to 42 U.S.C. § 1983 against Defendants: a procedural due process claim under the Fourteenth Amendment and a Takings Clause claim under the Fifth and Fourteenth Amendments. (AC ¶¶ 142–63.)

Plaintiff's procedural due process claim purports to be both a facial and as-applied constitutional challenge. Specifically, Plaintiff alleges that the NJUPA—"both as applied and on its face with respect to foreign property owners like Plaintiff"—previously violated "and continues to violate" Plaintiff's due process rights by authorizing escheatment (or risking escheatment) of his property without notice. (*Id.* ¶¶ 1, 21, 144.) Because of the unnoticed escheatment and subsequent liquidation of Borquez's holdings, moreover, Plaintiff "did not receive fair compensation" for the value of Borquez's stock. (*Id.* ¶ 148.)

By contrast, Plaintiff's takings claim is only as applied to the previous taking of Borquez's Exxon stock. (*See id.* ¶ 144.) Plaintiff asserts that he "did not receive just compensation" when

---

[11] Plaintiff does not specify when he learned of the escheatment, nor when he began his "extensive efforts to recover [Borquez's] assets." (AC ¶ 93.)

[12] Under the NJUPA, claimants seeking recovery of liquidated stock are entitled to the net proceeds of the sale plus interest, as well as any dividends or other amounts that might accrue to the stock while it is in state custody. N.J. Stat. Ann. §§ 46:30B-68, -79.

Defendants paid out the NJUPA claim. (*Id.* ¶ 156.) Plaintiff alleges that "just compensation" required "put[ting] Plaintiff in the same position as he would have occupied if the property had not been seized and taken by the State for public use." (*Id.* ¶ 157.) Accordingly, Plaintiff asserts that Defendants undercompensated him by $136,354.77, "the difference between the value of the escheated Exxon stock at the time of the filing of the original complaint ($623,936) and the amount paid by the State in response to Plaintiff's claim, $487,581.23." (*Id.* ¶ 157 & n.14.)

Plaintiff seeks a mix of injunctive and declaratory relief to redress both constitutional injuries: (1) an injunction against Defendants preventing continued escheatment under and administration of the NJUPA, (2) an equitable accounting to identify other unconstitutionally escheated property, (3) the return ("rather than destr[uction] or liquidat[ion]") of property belonging to Plaintiff and class members, or the equivalent value had it not been seized, and (4) a declaration that "Defendants' administration of the NJUPA against Plaintiff and the Class Members in the ways outlined in this Complaint" is unconstitutional.[13] (*Id.*, Prayer for Relief ¶¶ A–F.)[14]

### C.    PROCEDURAL HISTORY

On December 19, 2024, Plaintiff filed his initial class action complaint challenging, both facially and as applied to him and the class, the constitutionality of the NJUPA's notice and compensation procedures.[15] (*See generally* ECF No. 1.) On February 3, 2025, some six weeks after

---

[13] The Amended Complaint is not specific as to which remedies pertain to which claims. In fact, Plaintiff appears to allege that he is entitled to complete relief under either claim. (*See* AC ¶¶ 148–49 (asserting that procedural due process claim entitles Plaintiff to "fair compensation for the loss of property" as well as injunction against administration of NJUPA); *id.* ¶¶ 157–62 (asserting that takings claim entitles Plaintiff to $136,354.77 and injunction against NJUPA).)

[14] Although not relevant at this stage, Plaintiff also seeks declaratory relief finding that "Defendants are financially responsible for all Class notice and the administration of Class relief." (AC, Prayer for Relief ¶ E.)

[15] In his original complaint, Plaintiff included claims for negligence against Kelmar Associates, LLC

filing his initial complaint, Plaintiff filed a motion for a temporary restraining order and preliminary injunction against Defendants to restrain their continued enforcement of the Act. (ECF No. 21.) The Court denied the motion for not sufficiently establishing "any of the four prongs required to demonstrate the necessity of a TRO." (ECF No. 31); *see Otsuka Pharm. Co. v. Torrent Pharms., Ltd.*, 99 F. Supp. 3d 461, 775 (D.N.J. 2015).

After a teleconference with the parties on March 4, 2025,[16] Defendants served their initial motion to dismiss on Plaintiff (but did not file it with the Court) on April 17, 2025. (ECF Nos. 39, 44.) Rather than oppose the motion, Plaintiff opted to amend his complaint pursuant to Rule 15(a)(1)(B), which he filed on May 5, 2025. (ECF Nos. 44, 45.) On August 15, 2025, Defendants filed the instant Motion, (MTD), Plaintiff opposed, ("Opp.," ECF No. 50), and Defendants replied, ("Reply," ECF No. 51). Defendants filed their motion pursuant to Rules 12(b)(1) and 12(b)(6), arguing that (1) the Court lacks subject-matter jurisdiction to hear Plaintiff's claims, (2) the Amended Complaint fails to state a claim, and (3) the Court should abstain from deciding this case "to avoid interference with [New Jersey's] efforts to maintain a comprehensive policy for regulating unclaimed property." (MTD at 2–3); *see generally Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Defendant's MTD is now ripe for decision.[17]

---

("Kelmar"), for its alleged failure to provide "meaningful pre-deprivation notice" to Plaintiff. (ECF No. 1 ¶¶ 96–101.) On April 2, 2025, Plaintiff voluntarily dismissed all claims against Kelmar without prejudice. (ECF No. 43.)

[16] At that teleconference, the parties agreed that, given the presence of threshold, jurisdictional issues, the Court would first decide the present Motion before setting a schedule for briefing a preliminary injunction. Because the Court presently dismisses this case for lack of jurisdiction, to the extent Plaintiff is still seeking a preliminary injunction, that motion would be denied as moot without prejudice. *See, e.g., Kroger, Inc. v. O'Donnell*, No. 07-3091, 2007 WL 3232586, at *5–6 (D.N.J. Oct. 31, 2007).

[17] On August 28, 2025, Plaintiff filed a letter "Notice of Subsequent Authority" directing the Court to recent developments in relevant caselaw. (ECF No. 52.) Defendants filed a letter response. (ECF No. 53.) The Court will not consider any arguments contained in the letters, even assuming Plaintiff's Notice was itself permissible. *See Atkins v. Capri Training Ctr., Inc.*, No. 13-06820, 2014 WL 4930906, at *10 (D.N.J. Oct. 1, 2014) ("Generally, if pertinent and significant authorities come to a party's attention after the party's

## II.    **LEGAL STANDARD**

### A.    RULE 12(B)(1) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear the claim. Fed. R. Civ. P. 12(b)(1). In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (internal quotation marks omitted). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska*, 462 F.3d at 302 n.3 (quoting *Mortensen*, 549 F.2d at 891).

---

brief has been filed, the party may advise the court of the relevant authority through a Notice of Supplemental Authority; however, a Notice of Supplemental Authority should not advance new arguments . . . ." (citing *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008))).

### B.    RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

For a complaint to survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The court accepts all allegations in the complaint as true and gives the plaintiff "the benefit of every favorable inference to be drawn therefrom." *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, a court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up).

### III.    DISCUSSION

#### A.    STANDING

Defendants challenge—and the Court has an independent obligation to consider—Plaintiff's Article III standing to bring his procedural due process claim.[18] (MTD at 20–27); *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). Article III limits federal courts' jurisdiction to "cases or controversies." U.S. Const. art. III, § 2. The doctrine of standing is one of the "landmarks" that identifies justiciable cases and controversies referred to in Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "Standing is a question of subject matter jurisdiction." *Petroleos Mexicanos Refinacion v. M/T King A (Ex-Tbilisi)*, 377 F.3d 329, 334 (3d Cir. 2004). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). To establish standing (and thus jurisdiction), a plaintiff must show that he or she "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

In the context of a class action, only the named plaintiff must demonstrate standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361–62 (3d Cir. 2015). However, "[i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the

---

[18] Defendants do not appear to challenge Plaintiff's standing for his second claim under the Takings Clause. (MTD at 20 (titling their discussion on standing "PLAINTIFF'S DUE PROCESS CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF LACKS ARTICLE III STANDING").) Even if they did, the Court is satisfied that Plaintiff has Article III standing for the takings claim. *See, e.g., Salvato*, 2022 WL 1224962, at *6 n.5 (holding that Plaintiff had standing to bring takings claims for un-noticed escheatment under NJUPA).

class." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). The named plaintiff in a class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.*

Defendants argue that Plaintiff has not suffered any "actual or imminent injury" to assert his procedural due process claim. (MTD at 21–25.) In doing so, Defendant distinguishes between Plaintiff's standing as a representative of the Borquez estate and in his individual capacity, arguing that he lacks standing on both fronts. (*Id.*)

### 1.    Representative Capacity Standing

First, Defendants assert that Plaintiff does not have standing on behalf of the Borquez estate because the NJUPA Administration already paid the Borquez estate "nearly $500,000" for the escheated Exxon stock. (*Id.* at 21.) Defendants also argue that Plaintiff lacks representative standing because he "identifies no other Estate property that could potentially escheat to the UPA in the future" to indicate a forthcoming future injury to the Borquez Estate. (*Id.*)

At least as representative of the Borquez estate, Plaintiff has standing. The Supreme Court has routinely recognized that plaintiffs who suffer "a classic pocketbook injury" have an actual and concrete injury for standing. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). When the Administration allegedly escheated Borquez's Exxon stock without proper notice and undercompensated him for that action, Borquez suffered precisely this actual and concrete injury. Defendants' argument to the contrary— that Plaintiff "alleges no facts supporting an inference that the stock was sold for less than fair market value or that his payment was less than the entire sale proceeds"—misapprehends what is

required of plaintiffs for Article III standing. (Reply at 5.) Indeed, Defendants' contention instead challenges Plaintiff's argument on the *merits*; Plaintiff has established a cognizable injury to assert his representative due process claim, even if Defendants believe it lacks substance. *See Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025) ("When the government assumes physical possession of another's unclaimed property, there is no ambiguity as to its position on the status of that property. *And when it does so without providing due process or just compensation, the owner has suffered sufficient injury to confer standing to challenge the government's action.* Of course, that is not to say the owner will prevail in claiming that the government acted unlawfully, only that the owner has a sufficiently concrete stake in the dispute to satisfy Article III." (emphasis added)); *Peters v. Cohen* (*Peters I*), No. 22-266, 2024 WL 645557, at *3 (E.D. Cal. Feb. 14, 2024) (holding that Plaintiff had standing to recover stock "appreciation he was not paid" under California unclaimed property law even where he had already received statutorily authorized amount), *aff'd*, No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025).

However, Plaintiff's representative standing for the past escheatment does not automatically confer standing to pursue all of his requested relief. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Although that injury does allow Plaintiff to pursue his requested injunctive and declaratory relief related to the already escheated property, (AC, Prayer for Relief ¶ D), it "is insufficient to enjoin the future enforcement of the UP[A]." *Peters I*, 2024 WL 645557, at *3. It is axiomatic in standing jurisprudence that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Plaintiff pleads no facts to indicate that there is "a sufficient likelihood" that any of *Borquez*'s property will be escheated "in

a similar way"—in fact, the Amended Complaint mentions no other property at risk at all.[19] *Id.* at

111. Accordingly, while Plaintiff's representative standing is sufficient for relief in connection

with Borquez's liquidated stock under both his procedural due process and takings claims, (AC,

Prayer for Relief ¶ D), it is insufficient for his sought-after injunction of the NJUPA under either

claim, (*id.* ¶¶ A, B, F).

### 2. *Personal Capacity Standing*

Nonetheless, Plaintiff asserts that he has standing to enjoin enforcement of the NJUPA in

his *individual* capacity. (MTD at 22–25.) Although Plaintiff has alleged no property of his own

that has been escheated under the NJUPA, Plaintiff alleges that he has personal standing to assert

his claims on several grounds. Plaintiff alleges that, "in an attempt to begin repurchasing some of

the property that New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon

Mobil through a brokerage called TradeUp Securities [("TradeUp")] (incorporated in New

Jersey)."[20] (AC ¶ 20.) Plaintiff argues that, because of the NJUPA's deficient notice scheme, "he

remains at risk" of this newly purchased stock "being escheated without notice." (*Id.*) Plaintiff

---

[19] For similar reasons, Plaintiff lacks standing to seek an equitable accounting. (AC, Prayer for Relief ¶ C.) Plaintiff alleges that, including Borquez's escheated stock, "[a]dditional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine." (*Id.* ¶ 95.) Plaintiff's nebulous purported injury is essentially a fishing expedition and is too speculative for standing purposes. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 200 (3d Cir. 2016) ("[S]peculation is not enough to sustain Article III standing."); *see also Heyer v. Experian Info. Sols. Inc.*, No. 19-15, 2019 WL 2869337, at *3 (E.D. Wis. July 3, 2019) ("Plaintiffs cannot use lawsuits as tools to test hunches."). Moreover, Plaintiff may not rely on the alleged escheatment of property from other foreign nationals in the class for his own standing to seek an equitable accounting. *In re Horizon*, 846 F.3d at 634 (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

[20] Plaintiff provides no information on the amount or value of Exxon Mobil Corporation stock he purchased with TradeUp. (AC ¶ 20.) This amount is relevant to how much notice he would be entitled to under the NJUPA, as holders only have to provide pre-escheatment notice to owners of presumed abandoned property worth over $50, N.J. Stat. Ann. § 46:30B-50, and the Administration only has to provide post-escheatment for property worth over $100, *id.* § 46:30B-51. However, given the average value of Exxon Mobil Corporation stock, the Court presumes that these thresholds are met. *Exxon Mobil Corp*, CNBC (last updated January 9, 2026), https://www.cnbc.com/quotes/xom.

asserts that, should he pursue his intended "buy-and-hold strategy for those shares" the NJUPA's pre-escheatment notice process would fail to prevent the escheatment of his stock *exactly as it did with Borquez's stock.* (*Id.* ¶¶ 102–10; *see also id.* ¶ 107 ("Accordingly, it is certain that Plaintiff's shares would escheat to New Jersey if he subscribed to a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years, and does not have automatic reinvestment of dividends. That is currently Plaintiff's plan for these shares.").)

Plaintiff's "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be 'certainly impending' to constitute an injury in fact." *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiff's recent purchase of Exxon stock is insufficient to confer standing for an illusory future injury. Despite Plaintiff's assertion that as a Chilean national, he "will ***certainly not*** receive notice under the NJUPA" before his current holdings are presumed abandoned, (Opp. at 27 (emphasis in original)), his Amended Complaint instead relies on a "highly attenuated chain of possibilities" that does not establish an imminent future injury, *Clapper*, 568 U.S. at 410.

Even if Plaintiff made no changes whatsoever to his investment strategy or his apparently preferred broker—TradeUp—and his shares remained subject to escheat under the NJUPA,[21] Plaintiff's theory of future injury relies on an extensive list of contingencies: (1) Because Plaintiff's asserted investment strategy would not result in unpaid dividends, (AC ¶ 20), TradeUp's "second mailing of a statement of account or other notification or communication" would have to

---

[21] Plaintiff alleges that TradeUp is incorporated in New Jersey, meaning that it would be treated as a holder expected to abide by the escheatment process of the NJUPA. (AC ¶ 102); *see* N.J. Stat. Ann. § 46:30B-10(e) (subjecting property to the NJUPA if the holder "is a domiciliary" of New Jersey and the last known address of the owner is a "foreign nation").

return *undeliverable*,[22] N.J. Stat. Ann. § 46:30B-31, despite Plaintiff's assertion that he provided

them his Chilean address, (AC ¶ 104); (2) Plaintiff would have to "go[] three years without

interacting" with TradeUp in one of the many ways specified by the NJUPA, (*id.* ¶ 105), including

by writing or "contemporaneous record,"[23] N.J. Stat. Ann. § 46:30B-7.1; (3) TradeUp would have

to forego sending (or, Plaintiff would have to affirmatively ignore) statutorily required pre-

escheatment notice, assuming Plaintiff's Exxon Mobil Corporation holdings are currently worth

---

[22] Alternatively, three years could pass also pass from TradeUp's decision to "discontinue[] mailings to the apparent owner," N.J. Stat. Ann. § 46:30B-31, which Plaintiff does not in any way allege TradeUp imminently plans to do with him or his account, (*see* AC ¶¶ 102–07).

[23] The complete statutory section states:

> Property shall not be presumed abandoned if within the period that the property remains unclaimed the apparent owner communicated in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder, with the holder concerning property or the account in which the property is held, or has otherwise indicated an interest in the property. A communication with an owner by a person other than the holder or its representative who has not in writing identified the property to the owner is not an indication of interest in the property by the owner. An indication of an owner's interest in property includes:

> the presentment of a check or other instrument of payment of a dividend or other distribution made with respect to an account or underlying stock or other interest in a business association or financial organization or, in the case of a distribution made by electronic or similar means, evidence that the distribution has been received;

> owner-directed activity in the account in which the property is held, including a direction by the owner to increase, decrease, or change the amount or type of property held in the account; or

> the payment of a premium with respect to a property interest in an insurance policy.

> The application of an automatic premium loan provision or other nonforfeiture provision contained in an insurance policy does not prevent a policy from maturing or terminating if the insured has died or the insured or the beneficiary of the policy has otherwise become entitled to the proceeds before the depletion of the cash surrender value of a policy by the application of those provisions.

N.J. Stat. Ann. § 46:30B-7.1. In reply, Defendants suggests that owners can indicate interest simply receiving "an electronic distribution," or through "nominal acts like logging in to an account" associated with the property. (Reply at 7.) The NJUPA's listed indications of interest, although likely non-exhaustive, does not include Defendants' examples. Moreover, merely logging into an account or receiving an email from a broker would require far less from the owner than the other examples listed in the statute, which otherwise contemplates more affirmative acts from the owner to demonstrate interest. However, because the Court finds that Plaintiff's claim to standing is too speculative even under the plain language and given examples of the statute, it need not determine whether Defendants' suggested activities are fair interpretations of an "indication of an owner's interest." N.J. Stat. Ann. § 46:30B-7.1.

more than $50,[24] *id.* § 46:30B-50; (4) the Administrator's post-escheatment publication efforts would have to fail to reach Plaintiff, *id.* § 46:30B-51, and Plaintiff would have to fail to access one of the commercial databases that tracks escheated property; and (5) Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock before the end of the Administrator's additional one-year waiting period,[25] *id.* § 46:30B-72.

A single break in this chain of events collapses Plaintiff's tenuous, hypothetical theory personal standing. Plaintiff's purported future injury is therefore not "certainly impending," nor is there "a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiff's hypothesized future injury depends "on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Shooting Sports Found. v. Att'y Gen.*, 80 F.4th 215, 219 (3d Cir. 2023). For Plaintiff's predicted escheatment to occur, Plaintiff would not only have to avoid contact with TradeUp for multiple years, but he would have to affirmatively ignore all statutorily required notice from TradeUp before the stock would be even

---

[24] Plaintiff interprets this section, which requires holder to send owner notice "by certified mail[] with return receipt requested," N.J. Stat. Ann. § 46:30B-50, as not applying *at all* where foreign owners, like Plaintiff, are outside of the range of certified mail. (AC ¶¶ 16, 20, 61–62; *see id.* ¶ 81 ("Because of NJUPA's framework for distributing notice, no one with a foreign address will have received any pre or post-deprivation notice.").) The Court declines to adopt Plaintiff's interpretation of Section 50. Plaintiff offers no cases from New Jersey courts interpreting the NJUPA this way, and nothing in the plain language of the statute appears to *relieve* holders of their notice obligations to foreign owners if certified mail is not an option. Further, New Jersey courts interpreting state statutes "attempt to discern and implement the Legislature's intent." *State v. Drury*, 919 A.2d 813, 820 (N.J. 2007) (citing *State v. Reiner*, 850 A.2d 1252 (N.J. 2004)). The purpose of NJUPA Section 50 is clearly to provide "[n]otice to [the] apparent owner." N.J. Stat. Ann. § 46:30B-50. In any event, Plaintiff's interpretation of the statute—that no notice is required when certified mail is not an option—implicates constitutional due process concerns. Under New Jersey law, "[u]nless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions." *Silverman v. Berkson*, 661 A.2d 1266, 1268 (N.J. 1995) (citing *N.J. State Bd. of Higher Ed. v. Bd. of Dirs. of Shelton Coll.*, 448 A.2d 988, 992 (N.J. 1982)). Plaintiff also does not allege that TradeUp—the holder hypothetically responsible for sending this notice—will interpret Section 50 as Plaintiff does and send him no pre-escheatment notice by other means, even with Plaintiff's last known address. (AC ¶ 104.)

[25] As discussed, Section 72 of the NJUPA allows owners to seek the return of their stock even "after the expiration of [the one-year] period . . . if [the stock] still remain[s] in the hands of the administrator." N.J. Stat. Ann. § 46:30B-72.

presumed abandoned—let alone escheated and liquidated. (AC ¶¶ 104–07); N.J. Stat. Ann. §
46:30B-50. To the extent that Plaintiff predicts that TradeUp will not provide pre-escheatment
notice, this, too, is impermissibly speculative. *Clapper*, 568 U.S. at 414 n.5 ("[P]laintiffs bear the
burden of pleading and proving concrete facts showing that the defendant's actual action has
caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered
choices made by independent actors not before the courts.'" (quoting *Lujan*, 504 U.S. at 562)).
This predicted course of conduct is particularly implausible given Plaintiff's assertion, mere
paragraphs later in the Amended Complaint, that he is "constantly monitor[ing]" his property out
of fear of future escheatment.[26] (*Id.* ¶ 111.) If Plaintiff were to notice the delivery of his stock to
the Administrator at any point before its liquidation, the NJUPA would allow him to recover it.
N.J. Stat. Ann. § 46:30B-72. Thus, Plaintiff's speculative series of events is insufficient to confer
standing for prospective injunctive relief. *See Peters v. Cohen* (*Peters II*), No. 24-1040, 2025 WL
733237, at *1 (9th Cir. Mar. 7, 2025) (concluding that German citizen plaintiff lacked standing to
enjoin future enforcement of California's Unclaimed Property Law for previous liquidation of his
Amazon stock).

Plaintiff also argues that the risk of escheatment-without-notice of his personal Exxon
Mobil stock *presently* injures him. Plaintiff asserts that "[b]ecause he cannot rely on [NJUPA]
notice, he is required to monitor the property continuously" to avoid escheat. (AC ¶ 111.) This,
Plaintiff suggests, requires him to "churn and monitor that property (and other property) in order
to ensure that the Administrator does not attempt to seize it." (*Id.* ¶ 108.) Because of his looming
fears of the NJUPA, Plaintiff avers that he is discouraged from acquiring "further property that

---

[26] Even when crediting Plaintiff's well-pled facts as true on a motion to dismiss, the Court "need not accept
factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at
*2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F.
Supp. 2d 1195, 1208 (M.D. Fla. 2007)).

might be subject to seizure." (*Id.* ¶ 112.)

These allegations of present injury, too, are insufficient to confer personal standing on Plaintiff.[27] Although plaintiffs must "clearly and specifically set forth facts sufficient" to satisfy standing on a motion to dismiss, *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 86–87 (3d Cir. 1991), courts must still "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Courts may, however, require plaintiffs to "go beyond these general allegations in the complaint and allege particularized facts supportive of its standing." *Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990) (citing *Warth*, 422 U.S. at 501–02). Plaintiff's bare, conclusory allegations of the "real and concrete cost[s]" he incurs "constantly monitoring his property to avoid escheat," are insufficiently concrete to confer standing.[28] (AC ¶ 111.) Moreover, Plaintiff's supposed "churn[ing] and monitor[ing]," (*id.* ¶ 108), is inconsistent with his assertion that he intends to undertake an idle, "buy-and-hold" investment strategy certain to end in escheatment, as, by his account, he does not plan to undertake the necessary efforts that would prevent escheatment under the NJUPA, (*id.* ¶ 107). Although Rule 8(d) allows Plaintiff to plead "alternative" and "inconsistent" legal theories, the Court "need not accept factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007)). Plaintiff's two personal standing theories are plainly

---

[27] Because the Court finds that Plaintiff lacks a cognizable injury-in-fact, it does not address Defendants' related argument that Plaintiff's asserted personal injuries are self-inflicted and not traceable to Defendants' conduct. (MTD at 25–27.)

[28] Similarly, Plaintiff's assertion that the NJUPA "deters Plaintiff from acquiring further property that might be subject to seizure" is insufficient for standing. (AC ¶ 112.) Not only is not all of Plaintiff's "property in the United States" subject to escheatment under the New Jersey UPA, (*id.*), but bare "[a]llegations of a subjective 'chill,'" without specifics, are not concrete enough for standing, *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

irreconcilable and each independently fail to confer standing. Thus, Plaintiff lacks standing to assert his claims in his individual capacity, and lacks standing to enjoin the enforcement of the NJUPA,[29] (AC, Prayer for Relief ¶¶ A, B, F).

Plaintiff's reliance on *Taylor v. Westly* (*Taylor II*), 488 F.3d 1197 (9th Cir. 2007) (per curiam), for personal standing is misplaced. In *Taylor II*, the Ninth Circuit held that the plaintiffs had standing to challenge the California unclaimed property law both for the risk of future escheatment and the present costs on plaintiffs "of having to constantly monitor their property." *Id.* at 1999–1200. The present case is readily distinguishable. First, the *Taylor II* plaintiffs had already *personally* suffered previous escheatment of their property. *Id.* at 1199. This meant that the Ninth Circuit evaluated their standing and the risk of a future escheatment based on the "realistic likelihood" of recurrence standard, *id.*, not whether the injury was "certainly impending" as discussed hereinabove, *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2).[30] As discussed hereinabove, Plaintiff's speculative "chain of contingencies," *id.* at 410, depends on a number actions—some by non-parties like TradeUp—that "may not occur at all." *Nat'l Shooting Sports Found.* 80 F.4th at 219. Second, in briefing their present-injury standing, the plaintiffs in *Taylor II* asserted specific and concrete costs associated with monitoring and "churning" their

---

[29] Further, even assuming, *arguendo*, Plaintiff is incurring various costs to prevent escheatment, the Third Circuit has held—at least in the data breach context—that costs incurred "prophylactically" to prevent injury are insufficient to confer standing. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d. Cir. 2011) ("That a plaintiff has willingly incurred costs to protect against an alleged increased risk . . . is not enough to demonstrate a 'concrete and particularized' or 'actual or imminent' injury."); *see also Clapper*, 568 U.S. at 422 ("[Plaintiffs] cannot manufacture standing by incurring costs in anticipation of non-imminent harm.").

[30] In *Clapper*, the Supreme Court reversed specifically because of the Second Circuit's "objectively reasonable likelihood" standard in assessing the likelihood of future injury, finding it inconsistent with requirement that a "threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the Ninth Circuit's standard in *Taylor II*—which notably predates *Clapper*—is applicable to the risk of repeated injury as articulated in *City of Los Angeles v. Lyons*, that standard does not apply here. *See* Curtis A. Bradley & Ernest A. Young, *Standing and Probabilistic Injury*, 122 Mich. L. Rev. 1557, 1578–88 (2024) (distinguishing *Clapper* and *Lyons*).

property to prevent escheatment.[31] *Id.* at 1199–1200. Here, by contrast, Plaintiff offers only conclusory assertions that specify no actual costs or burden he is undertaking to prevent escheatment. (AC ¶¶ 108, 111.)

In short, Plaintiff has standing, in his capacity as representative of the Borquez estate, to seek relief in connection with the *previous* escheatment of Borquez's Exxon stock. (*Id.*, Prayer for Relief ¶ D.) Plaintiff's standing thus only supports his claims for the return of funds he believes he is owed—relief which Plaintiff purports to seek under *both* his procedural due process claim and his takings claim.[32] (*Id.* ¶¶ 148, 157–59.) However, Plaintiff does not have standing in either his representative or individual capacity to seek an equitable accounting or prospective injunctive and declaratory relief for hypothetical *future* escheatment or ongoing *present* injury. (*Id.*, Prayer for Relief ¶¶ A, B, C, F.)

### B.    ELEVENTH AMENDMENT IMMUNITY

This leaves only Plaintiff's request, under both his procedural due process and takings claims, for compensation for Borquez's stock that was escheated under the NJUPA. (AC ¶¶ 148, 156–57.) Defendants argue that these remaining claims are barred by Eleventh Amendment sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one

---

[31] For example, as discussed in the *Taylor II* plaintiffs' reply brief in support of their preliminary injunction motion, some of the plaintiffs had gone so far as to take "possession of their original stock certificates" and place them in bank deposit boxes for safekeeping. Pl.'s Reply Mem. at 11, *Taylor v. Westly*, No. 01-2407 (E.D. Cal. Aug. 1, 2005), ECF No. 47 (emphasis omitted). Even that deliberate conduct was not enough to prevent escheat, as "the [California] Controller compelled the Holders to issue duplicate certificates to the Controller, which he immediately sold without notice." *Id.*

[32] Although Plaintiff does not have standing to seek the other forms of injunctive relief under either claim for the reasons discussed hereinabove, he likely could not seek it pursuant to his takings claim anyway. (AC ¶ 162 (seeking to enjoin Defendants from enforcing the NJUPA under takings claim)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law.").

of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

State." U.S. Const. amend. XI. Ordinarily, the Eleventh Amendment, as construed by relevant

caselaw, "has been interpreted to make states generally immune from suit by private parties in

federal court." *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (collecting

cases). "This immunity extends to state agencies and departments." *Id.* (citing *C.H. ex rel. Z.H. v.

Oliva*, 226 F.3d 198, 201 (3d Cir. 2000) (en banc)).

Sovereign immunity is subject to narrow exceptions. *See Sinico v. Barry*, No. 18-01259,

2020 WL 528765, at *5 (M.D. Pa. Feb. 3, 2020). As relevant here, the *Ex parte Young*, 209 U.S.

123 (1908), doctrine allows "suits against state *officials* in certain circumstances." *Waterfront

Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (citing *Va. Off. for

Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011)). "Under the *Ex parte Young* doctrine, a

state official is stripped of his official or representative character and thereby deprived of the

State's immunity when he commits an ongoing violation of federal law," allowing "a person who

is aggrieved [to] . . . seek prospective relief by suing [that state official] in his official capacity."

*Waterfront Comm'n*, 961 F.3d at 238 (cleaned up). However, the *Young* exception allows only for

"prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be

retrospective, such as money damages." *MCI Telecom. Corp.*, 271 F.3d at 506 (citing *Pennhurst

State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984)).

Furthermore, given the structure of the NJUPA, the Eleventh Amendment is not implicated

*at all* insofar as relief seeks "the return of [Plaintiff's] and the class's *own property*." *Salvato*, 2022

WL 1224962, at *4 (emphasis in original). As discussed hereinabove, the escheatment of property

under the NJUPA is *custodial* in nature: unclaimed funds the Administration has escheated are

"held by the Treasurer as trustee for the *public interest*," not the State of New Jersey. *Clymer*, 792

A.2d at 400; *Am. Exp. Travel Related Servs. Co.*, 755 F. Supp. 2d at 565 ("[T]he purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner."). The property never permanently escheats to the State, as owners can claim their property "at any time in perpetuity." *Clymer*, 792 A.2d at 400 (citing N.J. Stat. Ann. § 46:30B–77); *Salvato*, 2022 WL 1224962, at *5 n.4.

This distinction between "permanent" and "custodial" escheatment is critical for sovereign immunity purposes. As the Supreme Court of the United States has explained, "the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Where a plaintiff simply seeks the *return* of their property, that suit is not barred by the Eleventh Amendment because "the taking of the property or the injury to it was not the action of the sovereign because [the taking was] unconstitutional or beyond the officer's statutory powers." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 698–99 (1949) (footnote omitted). Because owners retain a "legal or equitable interest in property" escheated under the NJUPA and held by the Administration *forever*, a claim seeking the return of property is "not for 'damages' against the State." N.J. Stat. Ann. § 46:30B-6(k) (defining "owner"); *see Clymer*, 792 A.2d at 400; *Salvato*, 2022 WL 1224962, at *6; *Taylor v. Westly (Taylor I)*, 402 F.3d 924, 932 (9th Cir. 2005) ("The State of California's sovereign immunity applies to the state's money. Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars.").

In this case, however, Plaintiff concedes that he received the proceeds of the sale of Borquez's Exxon stock. (AC ¶ 157.) Plaintiff thus does not simply seek the *return* of his property: Plaintiff requests to be put "in the same position monetarily as [he] would have occupied" but for the escheatment, "including compensation for any appreciation in the value of the property since

its seizure." (*Id.*, Prayer for Relief ¶ D.) By Plaintiff's account, he "would need an additional $136,354.77 beyond what New Jersey remitted to him" to be made whole, based on the value of the Exxon stock when he filed his original complaint. (*Id.* ¶¶ 157 n.14, 159.)

The Eleventh Amendment bars such relief. Plaintiff can only circumvent New Jersey's sovereign immunity to seek his "*escheated property* and *sales proceeds from escheated property*." *Taylor I*, 402 F.3d at 932 (emphasis added). Plaintiff is "not entitled to *more* than the actual property that the State took into its possession or the proceeds of that property." *Suever v. Connell*, 579 F.3d 1047, 1059 (9th Cir. 2009) (citing *Taylor I*, 402 F.3d at 932). Plaintiff's request is one for "additional compensation," and is "indistinguishable in effect from claims for money damages against the State and, as such, are barred by the Eleventh Amendment."[33] *Peters II*, 2025 WL 733237, at *2 (quoting *Suever*, 579 F.3d at 1059); *cf. Salvato*, 2022 WL 1224962, at *4 (finding that the Eleventh Amendment did not bar recovery "insofar as Plaintiff's claims only request the return of her and the class's *own property*," whether as physical shares or proceeds from any sale thereof (citing *Edelman v. Jordan*, 451 U.S. 651, 655–57 (1974))).

Relevant case law emphasizes the distinction for sovereign immunity purposes between plaintiffs who have already recovered the proceeds of their escheated property (like Plaintiff here) and those who have not. For example, the Ninth Circuit held in *Taylor I, Garza v. Woods*, and *Mousseau v. Crum* that the Eleventh Amendment did not bar the plaintiffs from recovering their escheated property if the state operated under a similarly custodial unclaimed property system. *Taylor I*, 402 F.3d at 930–35 (previous California unclaimed property law); *Garza*, 150 F.4th at

---

[33] Even if framed as seeking "injunctive" relief, (AC, Prayer for Relief ¶ D), Plaintiff's remedy plainly does not fall under the *Ex parte Young* exception. *See Suever*, 579 F.3d at 1058–59; *Taylor I*, 402 F.3d at 935; *see also Merritts v. Richards*, 62 F.4th 764, 772 (3d Cir. 2023) (holding that *Ex parte Young* did not apply where plaintiff failed to show "ongoing violation of federal law" based on previous state condemnation action and "injunction to cure past injuries" was not prospective relief).

1125–26 (Arizona); *Mousseau*, No. 24-1802, 2025 WL 2437230, at *1 (9th Cir. Aug. 25, 2025)

(mem.) (Alaska). Applying the reasoning of *Taylor I*, Judge Wolfson concluded the same for stock

or other property still held by the NJUPA Administrator. *See Salvato*, 2022 WL 1224962, at *4–

6. The Eleventh Circuit recently reached a similar holding with respect to Florida's custodial

escheatment statute where the plaintiffs had not yet received their stock or compensation. *Maron

v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331, 1333–34 (11th Cir. 2025).

　　However, in the cases in which states had returned the proceeds of liquidated property and

plaintiff sought *additional* compensation—namely, as here, the appreciated value of escheated

stock—courts have held that sovereign immunity bars such recovery. *See Suever*, 579 F.3d at

1058–60 (barring recovery of "the amount of the difference between the proceeds of the sale of

their unclaimed property and the current market value"); *Peters II*, 2025 WL 733237, at *2 (barring

recovery of "the difference between the current market value of [plaintiff's] escheated stock and

the price at which it was sold in 2018"). Here, Plaintiff seeks the same relief as that barred by the

Ninth Circuit in *Suever* and *Peters*. (AC, Prayer for Relief ¶ D.)

　　Because Plaintiff has already received the value of Borquez's liquidated Exxon stock, his

requests for further monetary relief—under both of his 42 U.S.C. § 1983 claims against state

officials in their official capacities—are barred by the Eleventh Amendment. *Johnson v. Stith*, No.

14-5032, 2015 WL 4997413, at *4 (D.N.J. Aug. 20, 2015) ("It is well settled that the Eleventh

Amendment's grant of sovereign immunity applies to Section 1983 claims brought against the

States." (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979))); *Segura v. Greystone Park Psychiatric

Hosp.*, No. 21-11662, 2024 WL 414105, at *7 (D.N.J. Feb. 5, 2024) ("Section 1983 claims seeking

monetary damages are subject to the Eleventh Amendment sovereign immunity bar." (citing *Will*

*v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989))).[34]

Accordingly, because Plaintiff either lacks standing to assert his claims or his requested relief is barred by the Eleventh Amendment, Defendants' MTD is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED** for lack of subject matter jurisdiction. In light of the Third Circuit's decision in *Merritts v. Richards*, 62 F.4th 764, 772 n.4 (3d Cir. 2023), and in the abundance of caution, the dismissal will be **WITHOUT PREJUDICE** and the Court will grant Plaintiff leave to amend and file what would be his third operative complaint, in the event he chooses to do so. The Court declines to address the remaining issues.[35]

---

[34] Although the Third Circuit has not definitively held that Fifth Amendment Takings Clause claims brought against state officials in their official capacities under 42 U.S.C. § 1983 are barred by sovereign immunity, the "overwhelming weight of authority among the circuits" suggests that sovereign immunity is a bar where "the state provides a remedy of its own for an alleged violation." *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, Nos. 19-11285, 20-634, 2021 WL 4198332, at *9 & n.12 (S.D.N.Y. Sept. 14, 2021) (quoting *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 40 (E.D.N.Y. 2020)) (collecting cases). In addition to providing an ability to appeal the Administrator's determination under the NJUPA itself, N.J. Stat. Ann. § 46:30B-84, New Jersey provides a remedy for unauthorized deprivations of property under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1 *et seq.*

[35] While the Court finds that it lacks jurisdiction to adjudicate Plaintiff's claims, Plaintiff's Amended Complaint likely contains other issues. As an initial matter, Plaintiff mischaracterizes part of his due process challenge of the NJUPA as a "facial" challenge. (AC ¶ 145 ("Therefore, the Statute is facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property."); Opp. at 33 ("With respect to the class of foreign property owners, the Act is unconstitutional in every instance.").) This is not a facial challenge; it is as applied. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid. That is, [a plaintiff] would have to show that the statute is unconstitutional in all of its applications. This is the most difficult challenge to mount successfully. On the other hand, an as-applied attack does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." (cleaned up)). Moreover, the Court notes that several cases have recognized that, given the custodial nature of the NJUPA, Plaintiff may be unable to assert a claim under the Takings Clause at all, as the escheated property is never taken for "public use." *See Garza*, 150 F.4th at 1127; *Mousseau*, 2025 WL 2437230, at *1; *Peters II*, 2025 WL 733237, at *2. *But see Knellinger v. Young*, 134 F.4th 1034, 1043–45 (10th Cir. 2025) (concluding the opposite).

## CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED** and Plaintiff's Amended

Complaint is **DISMISSED WITHOUT PREJUDICE**. An appropriate Order will accompany this

Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: January 12, 2026